No. 25-1354

# In The United States Court Of Appeals For The Seventh Circuit

————————

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

STEVEN ANDEREGG,

Defendant-Appellee.

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN, NO. 24-CR-50-JDP
(HON. JAMES D. PETERSON, CHIEF DISTRICT COURT JUDGE)

————————

OPENING BRIEF FOR THE UNITED STATES

————————

MATTHEW R. GALEOTTI
   Head of the Criminal Division

JOSH A. GOLDFOOT
   Deputy Assistant Attorney General

ROSS B. GOLDMAN
WILLIAM G. CLAYMAN
   Criminal Division
   Child Exploitation & Obscenity
    Section
   U.S. Department of Justice
   1301 New York Ave. NW
   Washington, DC 20530
   (202) 532-4153

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34 and 7th Cir. Rule 34(f), the United States requests oral argument and submits that oral argument will assist the Court in resolving the constitutional issue involved in this appeal.

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................ii

TABLE OF AUTHORITIES ........................................................................iv

INTRODUCTION ..........................................................................................1

JURISDICTIONAL STATEMENT ............................................................2

ISSUE PRESENTED.....................................................................................3

STATEMENT OF THE CASE.....................................................................3

    A.    Procedural History............................................................................3

    B.    Facts ...................................................................................................4

        1.    Anderegg distributes realistic, AI-generated, obscene images of minors engaging in sexually explicit conduct to a 15-year-old. ..........................................................4

        2.    Anderegg produces and possesses realistic, AI-generated, obscene images of minors engaging in sexually explicit conduct, including lasciviously exhibiting their genitals, touching their genitals, oral sex, and penetrative sex.........................................6

    C.    District Court Proceedings .............................................................7

    D.    Ruling Under Review.......................................................................8

SUMMARY OF ARGUMENT .....................................................................8

ARGUMENT ................................................................................................10

THE DISTRICT COURT ERRED IN DISMISSING THE POSSESSION COUNT. ....................................................................10

    A.    Standard of Review........................................................................10

    B.    Applicable Legal Framework........................................................10

        1.    Obscenity and Child Pornography........................................10

        2.    *Stanley v. Georgia* ................................................................12

C.    Section 1466A is constitutional as applied to Anderegg's in-home possession of realistic, AI-generated, obscene images of minors engaging in sexually explicit conduct. .................................. 14

    1.    Application of Section 1466A(b)(1) here advances compelling child-safety interests that were not at issue and were not addressed in *Stanley*. ....................................... 14

    2.    Application of Section 1466A(b)(1) here proscribes Anderegg's use of interstate commerce in furtherance of his possession of obscene images of children engaged in sexually explicit conduct and therefore falls outside the limited right that *Stanley* protects. ....................................... 23

D.    The district court's decision is unpersuasive. ................................ 26

CONCLUSION ........................................................................................ 36

CERTIFICATE OF COMPLIANCE ........................................................ 37

SHORT APPENDIX

# TABLE OF AUTHORITIES

**Cases**

*Ameur v. Gates,*
 759 F.3d 317 (4th Cir. 2014) ............................................................... 27

*Armour & Co. v. Wantock,*
 323 U.S. 126 (1944) ............................................................................ 27

*Ashcroft v. Free Speech Coalition,*
 535 U.S. 234 (2002) ................................................... 8, 11, 17, 31, 33

*Brown v. Davenport,*
 596 U.S. 118 (2022) ............................................................................ 27

*Cohens v. Virginia,*
 19 U.S. (6 Wheat) 264 (1821) ....................................................... 27, 29

*Knowlton v. City of Wauwatosa,*
 119 F.4th 507 (7th Cir. 2024) ............................................................. 17

*Miller v. California,*
 413 U.S. 15 (1973) .............................................................................. 11

*Nat'l Pork Producers Council v. Ross,*
 598 U.S. 356 (2023) ............................................................................ 29

*New York v. Ferber,*
 458 U.S. 747 (1982) .......................................................... 11, 15, 21, 28

*Osborne v. Ohio,*
 495 U.S. 103 (1990) ......................... 9, 11, 13, 15, 19, 20, 21, 26, 27, 28, 29, 33, 34

*Paris Adult Theatre I v. Slaton,*
 413 U.S. 49 (1973) ........................................................................ 18, 23

*Smith v. United States,*
 431 U.S. 291 (1977) ........................................................ 12, 14, 23, 25

*Stanley v. Georgia,*
 394 U.S. 557 (1969) ........................ 2, 7, 12, 13, 20, 21, 23, 25, 28, 31, 34

*Stanley v. State,*
 224 Ga. 259 (Ga. 1968) ...................................................................... 12

iv

*TikTok v. Garland,*
    604 U.S. ----, 145 S. Ct. 57 (2025) .......................................................... 17

*Turkiye Halk Bankasi A.S. v. United States,*
    598 U.S. 264 (2023) ...................................................................... 27, 29

*Turner Broadcasting Sys., Inc. v. FCC,*
    520 U.S. 180 (1997) ........................................................................... 17

*United States v. 12 200-Foot Reels,*
    413 U.S. 123 (1973) .......................................................... 13, 23, 27, 34

*United States v. Andersson,*
    803 F.2d 903 (7th Cir. 1986) .......................................................... 13, 27, 30

*United States v. Angle,*
    234 F.3d 326 (7th Cir. 2000) ............................................................ 20, 26

*United States v. Arthur,*
    51 F.4th 560 (5th Cir. 2022) .......................................................... 12, 16, 32

*United States v. Bentler,*
    W.D.N.Y. No. 24-cr-142 ......................................................................... 22

*United States v. Buie,*
    946 F.3d 443 (8th Cir. 2019) ................................................................. 12

*United States v. Chambers,*
    642 F.3d 588 (7th Cir. 2011) ................................................................. 15

*United States v. Greve,*
    490 F.3d 566 (7th Cir. 2007) ................................................................. 10

*United States v. Handley,*
    564 F.Supp.2d 996 (S.D. Iowa 2008) ....................................................... 24

*United States v. Jenkins,*
    854 F.3d 181 (2d Cir. 2017) ................................................................. 17

*United States v. Ker Yang,*
    799 F.3d 750 (7th Cir. 2015) ................................................................. 27

*United States v. Knox,*
    32 F.3d 733 (3d Cir. 1994) ............................................................... 28, 30

*United States v. Kussmaul,*
  987 F.2d 345 (6th Cir. 1993) ................................................................ 30

*United States v. Mees,*
  2009 WL 1657420 (E.D. Mo. June 10, 2009) ...................................... 24

*United States v. Morales-de Jesus,*
  372 F.3d 6 (1st Cir. 2004) ..................................................................... 30

*United States v. Orito,*
  413 U.S. 139 (1973) ....................................................................... 23, 25

*United States v. Ostrander,*
  114 F.4th 1348 (11th Cir. 2024) ..................................................... 22, 34

*United States v. Peel,*
  595 F.3d 763 (7th Cir. 2010) ................................................................ 31

*United States v. Perry,*
  D. Idaho No. 24-cr-129 .......................................................................... 22

*United States v. Reaves,*
  253 F.3d 1201 (10th Cir. 2001) ............................................................ 15

*United States v. Reidel,*
  402 U.S. 351 (1971) ............................................................... 23, 28, 30

*United States v. Reilly,*
  662 F.3d 754 (6th Cir. 2011) ................................................................ 15

*United States v. Richardson,*
  856 F.2d 644 (4th Cir. 1988) ................................................................ 30

*United States v. Schales,*
  546 F.3d 965 (9th Cir. 2008) ................................................... 11, 12, 32

*United States v. Schram,*
  128 F.4th 922 (8th Cir. 2025) ............................................................... 16

*United States v. Taylor,*
  2016 WL 787245 (A.F. Ct. Crim. App. 2016) ...................................... 24

*United States v. Thirty-Seven (37) Photographs,*
  402 U.S. 363 (1971) .............................................................................. 23

*United States v. Thoma*,
  726 F.2d 1191 (7th Cir. 1984) ............................................................ 30

*United States v. Villard*,
  885 F.2d 117 (3d Cir. 1989) ................................................................ 12

*United States v. Vincent*,
  167 F.3d 428 (8th Cir. 1999) ..................................................... 13, 29, 30

*United States v. Whorley*,
  550 F.3d 326 (4th Cir. 2008) ...................................................... 12, 23, 32

*United States v. Williams*,
  553 U.S. 285 (2008) .................................................................. 10, 13, 30

*United States v. Yashar*,
  166 F.3d 873 (7th Cir. 1999) ................................................................ 4

*United States v. Yeasley*,
  D. Idaho No. 23-cr-273 ...................................................................... 22

**Statutes**

18 U.S.C. § 1462 ............................................................................. 23

18 U.S.C. § 1466A ....................................... 1, 2, 3, 7, 11, 12, 16, 24, 32, 34

18 U.S.C. § 1470 .......................................................................... 3, 7

18 U.S.C. § 2252 ............................................................................. 16

18 U.S.C. § 2252A ........................................................................... 16

18 U.S.C. § 2256 ....................................................................... 11, 31

18 U.S.C. § 2258A ........................................................................... 18

18 U.S.C. § 3231 ............................................................................. 3

18 U.S.C. § 3731 ............................................................................. 3

Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996) ................................................................................... 15, 18

Fed. R. App. P. 4 .................................................................................... 3

Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act, Pub. L. 108-21, 117 Stat. 650 (2003) .......................... 11, 15, 17, 32, 33

U.S.S.G. § 2G2.2 ................................................................................... 16

## Other Authorities

Congressional Testimony of John Shehan, Senior Vice President, NCMEC, "Addressing Real Harm Done by Deepfakes" (Mar. 12, 2024) ..................... 19, 33

Internet Watch Foundation, "What has changed in the AI CSAM landscape" (July 2024) ................................................................................... 16

Nat'l Center for Missing & Exploited Children, "Generative AI CSAM is CSAM" (Mar. 11, 2024) ...................................................................... 19

The Guardian, "AI is overpowering efforts to catch child predators, experts warn" (July 18, 2024) ................................................................... 16, 19

Congressional Testimony of Yiota Souras, Chief Legal Officer, NCMEC, "The World Wild Web: Examining Harms Online" (Mar. 26, 2025) ..................... 19

U.S. Sentencing Comm'n, "Federal Child Pornography Offenses" (2012) ............. 18

WeProtect Global Alliance, "AI-produced child sexual abuse material: Insights from Dark Web forum discussions" (Sept. 11, 2024) ..................... 16

No. 25-1354

In The United States Court Of Appeals
For The Seventh Circuit

———————

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

STEVEN ANDEREGG,

Defendant-Appellee.

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

———————

**OPENING BRIEF FOR THE UNITED STATES**

———————

## INTRODUCTION

Defendant Steven Anderegg used artificial intelligence (AI) technology to generate obscene, photorealistic images of virtual children touching and lasciviously displaying their genitals and engaging in oral and penetrative sex acts with adult men. After getting a tip that he was sending similar images to a 15-year-old on Instagram, law enforcement conducted warrant-authorized searches of his Instagram accounts and his house, found his collection of obscene images of children engaged in sex acts on his laptop, and arrested him.

Among other offenses, Anderegg was charged with possessing obscene images of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. § 1466A(b)(1),

(d)(4). In moving to dismiss this charge before trial, Anderegg did not dispute that obscenity is generally not protected under the First Amendment. He argued, however, that dismissal was warranted under *Stanley v. Georgia*, 394 U.S. 557 (1969), which held that Georgia's prosecution of an individual for possessing obscene adult pornography in his bedroom violated his First Amendment right to receive information in the privacy of his home. The district court agreed and granted the motion.

The district court erred. *Stanley* is an exceedingly narrow decision that has been applied exceedingly narrowly, and this case differs from *Stanley* in all the ways that matter. Anderegg possessed images that were not only obscene, but that showed *children* engaged in sexually explicit conduct—the proscription of which is a critical tool to protect actual minors from sexual abuse. Anderegg also produced the images using materials that were transported in interstate or foreign commerce, as Section 1466A(d)(4) requires, and his possession thereby implicated Congress's interest in preventing injurious uses of the channels of commerce. *Stanley*, in contrast, involved obscenity depicting *adults*; the Supreme Court's decision was primarily a response to Georgia's paternalistic defense of its law as necessary to protect the adult possessor from the effects of viewing adult obscenity; and the Court did not address whether this adult obscenity had any connection to commerce.

The district court's unwarranted extension of *Stanley* and its order dismissing the possession count were erroneous. This Court should reverse.

## JURISDICTIONAL STATEMENT

The United States appeals from the district court's pretrial order dismissing

Count 4 of the indictment, which charged Anderegg with possessing an obscene image of a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. § 1466A(b)(1), (d)(4). App. 1-24.[1] The district court had jurisdiction under 18 U.S.C. § 3231 because this is a federal criminal prosecution.

The district court issued its decision on February 13, 2025. App. 1-21. The government filed a timely notice of interlocutory appeal on March 3, 2025. Doc. 74; *see* Fed. R. App. P. 4(b)(1)(B). This Court has jurisdiction under 18 U.S.C. § 3731.

## ISSUE PRESENTED

Whether 18 U.S.C. § 1466A(b)(1), as applied to Anderegg's in-home possession of obscene AI-generated images that depict realistic-looking minors engaging in sexually explicit conduct, and where he used interstate commerce in furtherance of that possession, violates the First Amendment.

## STATEMENT OF THE CASE

### A.     Procedural History

On May 15, 2024, a federal grand jury in the Western District of Wisconsin returned a four-count indictment charging Anderegg with production of an obscene visual depiction of a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. § 1466A(a)(1), (d)(4); distribution of such material, in violation of 18 U.S.C. § 1466A(a)(1), (d)(1); transferring obscene material to a person under 16, in violation of 18 U.S.C. § 1470; and possession of an obscene visual depiction of a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. § 1466A(b)(1), (d)(4). App. 22-24.

---

[1] "App." refers to the Short Appendix at the end of this brief. "Doc." refers to district court docket entries filed in this case.

Anderegg filed several pretrial motions, including a motion to dismiss the possession count, and on February 13, 2025, the district court dismissed the possession count. App. 1-21.[2] This interlocutory appeal followed.

###   B.    Facts[3]

#####       1.    Anderegg distributes realistic, AI-generated, obscene images of minors engaging in sexually explicit conduct to a 15-year-old.

On October 7, 2023, Anderegg was messaging with a 15-year-old boy (who told Anderegg he was 15) on Instagram. App. 2, 8-9, 14; Doc. 52-1 at 8-11. He told the boy that he had used Stable Diffusion—an AI platform that allows users to generate images based on text prompts that the user inputs—to create images that he posted on his account. App. 2, 9; Doc. 52-1 at 9 n.3. "[A]fter soliciting ideas from" the boy, Anderegg created and messaged him two AI-generated images of partially naked boys whose exposed, erect penises were the focus of the images. App. 2, 8-9; Doc. 52-1 at 7-11.

Instagram discovered Anderegg's activity and submitted two CyberTips to the National Center for Missing & Exploited Children, which referred the matter to law enforcement. App. 2; Doc. 52-1 at 7-12. In addition to the two images, the CyberTips provided portions of Anderegg's private chat with this minor; noted that Anderegg had posted numerous seemingly AI-generated images of minimally clothed minor

---

[2] The district court denied motions to dismiss the other three counts, as well as other relief, App. 1-21, and subsequently stayed the proceedings pending resolution of this interlocutory appeal, Doc. 77.

[3] The facts are set forth in the light most favorable to the government. *See United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999) ("We must view all facts in the light most favorable to the government on a motion to dismiss[.]").

boys or minor boys in bondage attire; and stated that Anderegg follows another Instagram user whose biography states: "great to meet on telegram and talk about young boy addiction !!" Doc. 52-1 at 7-8.

Based on this information, as well as information showing that in 2019 someone at Anderegg's home requested known child pornography involving prepubescent and young pubescent children engaged in sex acts from a peer-to-peer network, the government obtained a warrant to search Anderegg's Instagram accounts. App. 2; Doc. 52-1 at 7-15. Execution of that warrant uncovered a third AI-generated image of naked boys that Anderegg sent the minor, "as well as sexually explicit chats with minors," including chats that show Anderegg's sexual interest in minor boys. App. 2, 14; Doc. 52-2 at 34-35.

In each of the three images that Anderegg sent the minor, "the boys' erect penises are the focal point," and "[o]ther children are depicted as gazing at those erections, and in one image, gripping another's penis." App. 14; *see* App. 6.[4] The depicted boys had "*very* young" faces and can "fairly be described as prepubescent." App. 12. The images were "photorealistic in the sense that they are rendered in a style meant to look like photographs, as opposed to say a painting or drawing," even if in "other ways" they appear "slightly unreal." App. 12; *see* App. 12-13 ("The figures aren't a Frankenstein mashup of child and fully adult parts. The bodies may have somewhat more musculature than one would expect of a prepubescent boy, but the bodies are

---

[4] The district court reviewed the images in connection with resolving Anderegg's pretrial motions. App. 14.

all slender and youthful. The figures are rendered in a cohesive, realistic looking way despite some incongruities.").

> ### 2. Anderegg produces and possesses realistic, AI-generated, obscene images of minors engaging in sexually explicit conduct, including lasciviously exhibiting their genitals, touching their genitals, oral sex, and penetrative sex.

The government subsequently obtained and executed a warrant to search Anderegg's home. App. 2; *see* Doc. 52-2. Pursuant to that warrant, officers found that that Anderegg had downloaded and installed Stable Diffusion on his laptop, along with specialized software that facilitated the creation of images showing genitalia through Stable Diffusion. Doc. 64 at 5-6, 23.

Officers also found on Anderegg's laptop "more than 13,000 AI-generated images, many of them alleged to be of children engaged in sexually explicit conduct." App. 2. The images showed, among other things, nude or partially nude minors touching and lasciviously displaying their genitals; minors performing sex acts on adult males; and adult males engaging in penetrative sex acts with minors. Doc. 64 at 6. Computer forensics further showed that Anderegg used explicit text prompts—*e.g.*, "two cute nine year old gay emo boys enjoying a enormous throbbing penis"—to generate what he wanted using Stable Diffusion, as well as "negative prompts" to avoid generating adults (and other things) that he did not want. Doc. 64 at 6; *see* Doc. 52-1 at 9-10.[5]

---

[5] At the district court's request, the government provided to the court a thumb drive containing approximately 50 images that Anderegg possessed that the government argued were obscene. Doc. 82 at 9. Upon request, the government can similarly provide the images to this Court.

Following the search of Anderegg's home, a minor disclosed to law enforcement that Anderegg had been sexually abusing him. Doc. 20 at 2 (sealed); Doc. 64 at 6-7. The State of Wisconsin arrested Anderegg and, in February 2024, charged him with first degree child sexual assault—sexual contact or sexual intercourse with a person under 13, and two counts of exposing a child to harmful material. Doc. 64 at 6-7; *see* Doc. 60-1 (sealed); *State of Wisconsin v. Anderegg*, No. 2024CF000185. That case is currently set for trial in October 2025.

### C.     District Court Proceedings

On May 15, 2024, a grand jury returned a four-count indictment charging Anderegg with production, distribution, and possession of an obscene visual depiction of a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. § 1466A(a)(1), (b)(1), (d)(1), (d)(4); and transferring obscene material to a person under 16, in violation of 18 U.S.C. § 1470. App. 22-24.

Before trial, and as relevant here, Anderegg moved to dismiss the possession count on First Amendment grounds, arguing that because he possessed the material in his home, he was protected from prosecution under *Stanley v. Georgia*, 394 U.S. 557 (1969). App. 14-15; Doc. 52 at 39-43. The government opposed the motion, arguing principally that *Stanley* does not apply to obscene material depicting children—real or AI-generated—engaging in sexually explicit conduct; that Section 1466A(b)(1) is a critical tool to protect actual children from actual harm; and that Anderegg's use of interstate commerce to possess his obscene images also meaningfully distinguished this case from *Stanley* and brought it in line with post-*Stanley* Supreme Court precedent affirming the government's right to regulate obscenity in commerce. Doc.

64 at 8-24.

The district court dismissed the possession count. App. 14-19. The court held that *Stanley* applies to Anderegg's in-home possession of obscene depictions of AI-generated children engaging in sexually explicit conduct; that the government's child-protection arguments were unavailing in light of *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002); and that Section 1466A's interstate-commerce element did not affect the analysis. App. 14-19.

### D. Ruling Under Review

The government appeals the district court's order dismissing the possession count.

### SUMMARY OF ARGUMENT

Obscene speech and sexually explicit imagery of actual minors are both categorically unprotected under the First Amendment. Section 1466A(b)(1) explicitly reaches only material that is obscene, and that depicts a child engaging in sexually explicit conduct, and—as charged here—where the defendant's possession of such material has a nexus with interstate commerce. And Section 1466A(b)(1) is a critical tool in the government's effort to advance the compelling interest in protecting children from sexual exploitation and abuse and dismantling the marketplace for sexually explicit imagery of children.

In *Stanley v. Georgia*, the Supreme Court carved out a narrow exception to the otherwise categorical non-protection of obscene speech and held that the First Amendment protects the in-home possession of obscene material depicting adults. In so holding, *Stanley* refused to uphold the possession conviction based on the state's claimed need—which the Supreme Court subsequently characterized as "weak" and

8

"paternalistic"—to protect the adult possessor from the harms associated with possessing and viewing such material.

As the Supreme Court and this Court have recognized, *Stanley* is a narrow decision that has been applied narrowly. And this case differs from *Stanley* in ways that are constitutionally dispositive. Anderegg is being prosecuted under Section 1466A(b)(1) for possessing realistic, AI-generated images that are both obscene and that depict *a child* engaging in sexually explicit conduct, and where he used interstate commerce in furtherance of his possession of those images.

Section 1466A(b)(1), as applied here, is therefore much more like the Supreme Court's decision in *Osborne v. Ohio*, 495 U.S. 103 (1990)—which held that child pornography showing actual children is unprotected speech regardless of where it is possessed—and several of the Court's post-*Stanley* obscenity decisions—which held that *Stanley* does not apply to the regulation of obscene materials in interstate commerce—than it is *Stanley* itself. In expanding *Stanley* to immunize Anderegg's conduct, the district court overlooked these material distinctions and disregarded the Supreme Court's guidance to read and apply *Stanley* narrowly.

The district court also misinterpreted *Ashcroft v. Free Speech Coalition*. That decision invalidated on First Amendment grounds a federal definition of "child pornography" that reached material that showed no actual minor and that—critically here—was not obscene. But Section 1466A(b)(1) explicitly requires proof that the material is obscene and, as multiple courts of appeals have held, Section 1466A therefore presents no *Free Speech Coalition* problem. The district court's analysis of

*Free Speech Coalition* is also unpersuasive for the separate reason that the court did not account for the considerable post-*Free Speech Coalition* information showing just how acute the child-protection concerns are in the context of AI-generated obscene images of children engaged in sexually explicit conduct.

The district court's decision is in a class of one. To our knowledge, no other court has dismissed a Section 1466A(b)(1) count under *Stanley*, and those courts to have squarely addressed challenges like Anderegg's have rejected them. The district court's contrary conclusion overread applicable precedent and undervalued the critical child safety interests that Section 1466A(b)(1) protects. This Court should reverse.

## ARGUMENT

## THE DISTRICT COURT ERRED IN DISMISSING THE POSSESSION COUNT.

### A. Standard of Review

The district court dismissed the possession count on the ground that Section 1466A(b)(1) violates the First Amendment as applied to Anderegg's conduct. This Court reviews that legal determination de novo. *United States v. Greve*, 490 F.3d 566, 570 (7th Cir. 2007). The Court reviews factual findings for clear error. *Ibid.*

### B. Applicable Legal Framework

#### 1. Obscenity and Child Pornography

Obscene speech is unprotected under the First Amendment. *United States v. Williams*, 553 U.S. 285, 288 (2008). Material is obscene if it "appeals to the prurient interest, is patently offensive in light of community standards, and lacks serious

literary, artistic, political, or scientific value." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 246 (2002) (citing *Miller v. California*, 413 U.S. 15, 24 (1973)). Child pornography—*e.g.*, images of actual children engaging in sexually explicit conduct—is also categorically unprotected speech, and the First Amendment does not bar the government from criminalizing its production, distribution, or possession—even in one's own home. *Osborne v. Ohio*, 495 U.S. 103 (1990); *New York v. Ferber*, 458 U.S. 747 (1982).

In *Free Speech Coalition*, the Supreme Court held that the definition of "child pornography" then set forth in 18 U.S.C. § 2256(8)(B)—which applied to visual depictions that are, or that appear to be, of a minor engaging in sexually explicit conduct—violated the First Amendment because (i) it did not require proof that the image showed an actual minor, and (ii) it did not require proof that the image was obscene. *Free Speech Coalition*, 535 U.S. at 240-256. In response, Congress enacted the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 (the PROTECT Act), Pub. L. 108-21, 117 Stat. 650. *See United States v. Schales*, 546 F.3d 965, 970 (9th Cir. 2008). The PROTECT Act created a new statute, 18 U.S.C. § 1466A, which, as relevant here, makes it a crime to produce, distribute, or possess "a visual depiction of any kind … that (1)(A) depicts a minor engaging in sexually explicit conduct; and (B) is obscene." 18 U.S.C. § 1466A(a)(1), (b)(1); *see id.* § 1466A(f)(2) (defining "sexually explicit conduct" by cross-referencing 18 U.S.C. § 2256(2)(A) and (B)).[6] Section 1466A(c) provides that "[i]t is not a required

---

[6] The definition includes "actual or simulated" sexual intercourse, oral sex, masturbation, and lascivious exhibition of the genitals. 18 U.S.C. § 2256(2)(A). Material could conceivably

element of any offense under this section that the minor depicted actually exist." And Section 1466A(a)-(b) and (d)(1)-(4) require that the substantive offense have a nexus with interstate commerce.[7]

Section 1466A's obscenity element incorporates the three-part obscenity test from *Miller. See, e.g.*, *United States v. Buie*, 946 F.3d 443, 445-446 (8th Cir. 2019); *United States v. Whorley*, 550 F.3d 326, 337 (4th Cir. 2008); *see also Smith v. United States*, 431 U.S. 291, 299 (1977). Because Section 1466A requires proof of obscenity, the statute presents no First Amendment problem under *Free Speech Coalition. United States v. Arthur*, 51 F.4th 560, 568-569 (5th Cir. 2022); *Whorley*, 550 F.3d at 335-337; *Schales*, 546 F.3d at 971-972.

### 2.  *Stanley v. Georgia*

In *Stanley v. Georgia*, 394 U.S. 557 (1969), the defendant was convicted of possessing in his home obscene films of adults engaging in sexual activity, in violation of Georgia's obscenity statute. *Id.* at 558-559; *see Stanley v. State*, 224 Ga. 259, 259 (Ga. 1968) (films showed "nude men and women engaged in acts of sexual intercourse and sodomy"). Unlike Section 1466A, the Georgia statute reached the in-home

---

constitute child obscenity without depicting a child engaged in sexually explicit conduct as defined Section 2256(2) (for example, a man providing oral stimulation to a young girl's naked chest), just as material could meet the Section 2256(2) definition without being obscene, *see United States v. Villard*, 885 F.2d 117, 120-121 (3d Cir. 1989) ("exhibition of the genitals need not meet the standard for obscenity to be considered lascivious"). Section 1466A only applies to the subset of material that satisfies both standards.

[7] Section 1466A(d)(5) provides that the substantive prohibition applies when "the offense is committed in the special maritime and territorial jurisdiction of the United States or in any territory or possession of the United States."

possession of materials with no demonstrated connection to commerce. *See Stanley*, 394 U.S. at 558 n.1.

The Supreme Court reversed, holding generally that "obscenity is not protected by the First Amendment" but that the First Amendment does protect the "mere possession" of obscene material "in the privacy of a person's own home." *Stanley*, 394 U.S. at 560, 564-568. In so holding, *Stanley* rejected Georgia's primary defense of the statute, which rested on the claimed need to protect the possessor from the effects of the material. *Id.* at 565-566; *see Osborne*, 495 U.S. at 109. The Supreme Court subsequently explained that its decision in *Stanley* was a response to Georgia's "weak" and "paternalistic" concern "that obscenity would poison the minds of its viewers." *Osborne*, 495 U.S. at 109-110.

The Supreme Court has cautioned that *Stanley* was a "narrow holding" that "should not be read too broadly," *Osborne*, 495 U.S. at 108, and that rests on an "explicitly narrow and precisely delineated privacy right," *United States v. 12 200-Foot Reels of Super 8mm. Film*, 413 U.S. 123, 127 (1973). This Court has similarly noted that the Supreme Court has "limited" *Stanley*'s holding "severely." *United States v. Andersson*, 803 F.2d 903, 906 (7th Cir. 1986). For example, *Stanley* has often been described as protecting only the possession of obscene material "involving adults." *See, e.g.*, *Williams*, 553 U.S. at 288-289 (*Stanley* protects "the mere possession of obscene material involving adults"); *United States v. Vincent*, 167 F.3d 428, 431 (8th Cir. 1999) ("[*Stanley*] held states cannot criminalize possession of obscenity involving adults."); *infra* at 30. And *Stanley* does not protect the right to

import, distribute, transport, or receive obscene materials, even if those acts are done in furtherance of in-home possession. *See generally, e.g.*, *Smith*, 431 U.S. at 306-307; *infra* at 23-26.

### C. Section 1466A is constitutional as applied to Anderegg's in-home possession of realistic, AI-generated, obscene images of minors engaging in sexually explicit conduct.

Anderegg's conduct involved the possession of realistic, AI-generated, obscene images showing children engaging in sexually explicit conduct; application of Section 1466A(b)(1) here is consistent with the government's compelling need to protect children; and Anderegg's possession has a nexus with interstate commerce. *Stanley*, in contrast, involved materials depicting adults; the state's principal interest involved protecting the adult possessor from the asserted harms of viewing the material; and the state statute at issue in *Stanley* did not require any nexus with commerce.

These differences are constitutionally decisive. *Stanley* does not apply here. Instead, the default rule—obscene speech is categorically unprotected—does. The possession count was proper, and this Court should reinstate it.

#### 1. Application of Section 1466A(b)(1) here advances compelling child-safety interests that were not at issue and were not addressed in *Stanley*.

a. Anderegg's conduct is inextricably linked to the sexual exploitation of minors. He used AI technology to generate obscene, realistic images of children touching and lasciviously exhibiting their genitals and engaging in oral and penetrative sex with adult men; he publicized his ability to create these images online; and he sent some to a 15-year-old on Instagram and messaged others about his sexual attraction to underage boys. Congress enacted Section 1466A(b)(1)—which, by its terms, applies

only to obscene materials depicting children engaging in sexually explicit conduct—to empower the government to prosecute offenders like Anderegg who pose a risk to minors. *Cf.* PROTECT Act, § 501(9)-(14), 117 Stat. 650.

The need to criminalize the in-home possession of images like Anderegg's relates directly to the "compelling" need to protect real children from real "physical and psychological" harm. *Cf. Ferber*, 458 U.S. at 756-757 (quotation marks omitted). "The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance," *id.* at 757, and this consideration distinguishes this case from the narrow holding in *Stanley* and places it comfortably within the line of cases affirming the government's ability to proscribe sexually explicit imagery of children, *compare Osborne*, 495 U.S. at 108 ("But assuming, for the sake of argument, that Osborne has a First Amendment interest in viewing and possessing child pornography, we nonetheless find this case distinct from *Stanley* because the interests underlying child pornography prohibitions far exceed the interests justifying the Georgia law at issue in *Stanley*.").

The risks that material like Anderegg's poses to real children are varied, and they are acute. First, offenders may use images of the type that Anderegg possessed, like they commonly use similar-type images showing actual children, to groom minors into engaging in sexually explicit conduct. *See, e.g., Osborne*, 495 U.S. at 111; *United States v. Chambers*, 642 F.3d 588, 593 (7th Cir. 2011); *United States v. Reilly*, 662 F.3d 754, 761 (6th Cir. 2011); *United States v. Reaves*, 253 F.3d 1201, 1205 (10th Cir. 2001); Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, § 121 subsection 1(8),

110 Stat. 3009 (congressional finding that the grooming risks are "the same" whether the imagery shows actual or computer-generated children).[8] Indeed, Anderegg's distribution of obscene, sexually explicit images to the 15-year-old on Instagram is suggestive of precisely this type of grooming. And given how easy it is to create AI-generated imagery, and as AI-generated imagery becomes increasingly indistinguishable from imagery showing actual children,[9] the grooming risk only grows.

Second, as AI-generated imagery becomes more indistinguishable from imagery showing actual children, it will be increasingly difficult, if not impossible, to prove whether a depicted child is real or purely AI-generated. And because the main federal child pornography statutes, 18 U.S.C. §§ 2252 and 2252A, generally require proof that the depicted minor is real, the government will often have to rely on Section 1466A, which does not require proof that the depicted child actually exists, *see* 18 U.S.C. § 1466A(c); *Arthur*, 51 F.4th at 568-569. Expanding *Stanley* to protect the in-home possession of obscene imagery showing children engaging in sexually

---

[8] The Sentencing Guidelines recognize this grooming harm by providing for a seven-level enhancement if the Section 1466A or other enumerated offense involved "distribution to a minor that was intended to persuade, induce, entice, or coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct." U.S.S.G. § 2G2.2(b)(3)(E).

[9] *See, e.g.*, Internet Watch Foundation, "What has changed in the AI CSAM landscape," at 7, 25 (July 2024), https://www.iwf.org.uk/media/opkpmx5q/iwf-ai-csam-report_update-public-jul24v11.pdf; The Guardian, "AI is overpowering efforts to catch child predators, experts warn" (July 18, 2024), https://www.theguardian.com/technology/article/2024/jul/18/ai-generated-images-child-predators; *see also United States v. Schram*, 128 F.4th 922, 925-926 (8th Cir. 2025) ("[f]ew could dispute" that the "realistic output" of computer programs that generate images of virtual people are "becoming ever more realistic"); WeProtect Global Alliance, "AI-produced child sexual abuse material: Insights from Dark Web forum discussions" (Sept. 11, 2024), https://www.weprotect.org/blog/ai-produced-child-sexual-abuse-material-insights-from-dark-web-forum-discussions/.

explicit conduct could therefore insulate from prosecution offenders who possess such material showing *actual* children—a result that contradicts reason, *Osborne*, and clear congressional intent. *Cf.* PROTECT Act, § 501(9)-(14), 117 Stat. 650. *See generally Free Speech Coalition*, 535 U.S. at 259-260 (Thomas, J., concurring).

Nor must the government forgo or lose prosecutions before applying Section 1466A(b)(1) in cases like this. "In reviewing the constitutionality of a statute, courts must accord substantial deference to the predictive judgments of Congress." *Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (quotation marks omitted)). "Even in the realm of First Amendment questions where Congress must base its conclusions upon substantial evidence, deference must be accorded to its findings as to the harm to be avoided and to the remedial measures adopted for that end, lest we infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy." *Id.* at 196; *see also TikTok Inc. v. Garland*, 604 U.S. ----, 145 S. Ct. 57, 69-70 (2025); *Knowlton v. City of Wauwatosa*, 119 F.4th 507, 516 (7th Cir. 2024) ("Although the plaintiffs are correct that a government must demonstrate that … harms are real, not merely conjectural, a government need not wait to act until violence or harm materializes. Indeed, the government has an interest in preventing emergencies and threats to public safety, not merely responding to them after they transpire." (citation and quotation marks omitted)).

Third, an offender's engagement with AI-generated obscene material depicting children engaging in sexually explicit conduct may normalize sexual activity with children and in that way too pose risks to actual children. *Cf. United States v.*

*Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017) ("It is undoubtedly correct that 'all child pornography offenses are extremely serious because they both perpetuate harm to victims and normalize and validate the sexual exploitation of children.'" (quoting U.S. Sentencing Comm'n, "Federal Child Pornography Offenses," at 311 (2012)) (USSC Report)); *see* USSC Report at 312; Child Pornography Prevention Act of 1996, § 121 subsection 1(4), (8), (10)-(11), 110 Stat. 3009; *cf. Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 60-61 (1973). Anderegg's chats on Instagram in which he expressed a sexual interest in minor boys, his creation of obscene images of children engaged in sexually explicit conduct, his bespoke creation of such imagery for the 15-year-old on Instagram, his prior suspected effort to access child pornography showing actual children, and his ongoing Wisconsin prosecution for sexually abusing an actual child all evidence that Anderegg has a sexual interest in actual children in addition to AI-generated children.

The realistic nature of the imagery that Anderegg possessed also creates a problem of a different type for actual children. When, as happened here, an internet service provider determines that child sexual abuse material is on its platform, the provider is required to submit a CyberTip to the National Center for Missing & Exploited Children, which reviews the report and makes it available to the appropriate law enforcement agency for further investigation. *See* 18 U.S.C. § 2258A. In the case of realistic images like Anderegg's that show a child being sexually abused, law enforcement will take steps to identify, locate, and rescue that child. But given advances in AI technology, there is a real concern that law enforcement will spend its

limited time and resources searching for children who do not exist—which is obviously to the detriment of real children who do exist and who do need rescue.[10] This case again illustrates the risks: many of Anderegg's images are photorealistic, and it was only other facts (*e.g.*, his Instagram chats and the forensic search of his computer) that made clear that the children were virtual and not in need of rescue or the victim of a sexually explicit deepfake.

Finally, applying Section 1466A(b)(1) to conduct like Anderegg's is critical to help the government reduce the commercial market for this type of material. *Cf. Osborne*, 495 U.S. at 110-111 ("Given the importance of the State's interest in protecting the victims of child pornography, we cannot fault Ohio for attempting to stamp out this vice at all levels in the distribution chain. According to the State, since the time of our decision in *Ferber*, much of the child pornography market has been driven

---

[10] *See, e.g.*, Congressional Testimony of John Shehan, Senior Vice President, NCMEC, "Addressing Real Harm Done by Deepfakes," at 6 (Mar. 12, 2024) ("[AI-generated child sexual abuse material] complicates child victim identification because now NCMEC and/or law enforcement first must determine which cases depict a real child in need of rescue and which child victims are [AI-]generated for an offender's personal gratification."), https://www.missingkids.org/content/dam/missingkids/pdfs/final-written-testimony-john-shehan-house-oversight-subcommittee-hearing.pdf; Nat'l Center for Missing & Exploited Children, "Generative AI CSAM is CSAM" (Mar. 11, 2024) ("The creation and circulation of [AI-generated child sexual abuse material] is harmful and illegal. Even the images that do not depict a real child put a strain on law enforcement resources and impede identification of real child victims."), https://www.missingkids.org/blog/2024/generative-ai-csam-is-csam; The Guardian, *supra* ("The volume of sexually explicit images of children being generated by predators using artificial intelligence is overwhelming law enforcement's capabilities to identify and rescue real-life victims, child safety experts warn."); *see also* Congressional Testimony of Yiota Souras, Chief Legal Officer, NCMEC, "The World Wild Web: Examining Harms Online," at 10 (Mar. 26, 2025) ("NCMEC also is witnessing the disruptive impact of [generative] AI imagery on child victim identification. Law enforcement and NCMEC must ensure that their limited time and resources are used to identify real child victims, not depictions of children created by [generative] AI."), https://d1dth6e84htgma.cloudfront.net/Testimony_Yiota_Souras_5d485141ab.pdf.

underground; as a result, it is now difficult, if not impossible, to solve the child pornography problem by only attacking production and distribution."); *United States v. Angle*, 234 F.3d 326, 337 (7th Cir. 2000) (Congress can criminalize the intrastate possession of child pornography as a means to eliminate the market for child pornography, and because possessors can reasonably be expected to turn to the interstate market to obtain additional imagery).

As the Supreme Court has explained, it is "surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand." *Osborne*, 495 U.S. at 109-110. So too here. Moreover, applying Section 1466A(b)(1) to cases like this may result in offenders avoiding such material altogether, which would further help keep actual children safe. *Cf. Angle*, 234 F.3d at 337-338 ("It is also reasonable to believe the related proposition that discouraging the intrastate possession of pornography will cause some of these child pornographers to leave the realm of child pornography completely, which will in turn reduce the interstate demand for pornography." (internal quotation marks omitted)).

b. *Stanley* did not involve children or any of these compelling child-protection interests. The material at issue there depicted adults—not children—engaging in sexual acts. And the state defended the statute "primarily" on the claimed right to prevent the "poison[ing of] the minds of its viewers," *Osborne*, 495 U.S. at 109—not actual children. *See Stanley*, 394 U.S. at 565 ("Georgia asserts the right to protect the individual's mind from the effects of obscenity."); *id.* at 567 (noting that there was

20

"[n]o … danger" "in th[at] case" that Stanley's adult obscenity "might fall into the hands of children"). The Supreme Court balanced Georgia's asserted interest against the constitutional right affected by the state's enforcement of its obscenity law in that context and concluded that Georgia's "weak" and "paternalistic" interest, *Osborne*, 495 U.S. at 109-110, was insufficient. *Stanley*, 394 U.S. at 563-568.

But that "weak" and "paternalistic" interest is not at issue here and is materially different—in ways that are constitutionally determinative—from the compelling child-protection interests that *are* at issue here. Anderegg was not charged with possessing obscene depictions of adults engaging in sex acts, nor is the government justifying its prosecution of Anderegg under Section 1466A(b)(1) as necessary to protect the moral content of his thoughts. To the contrary, the government is relying on Section 1466A(b)(1) to protect actual children from the harms associated with the possession and proliferation of obscene images depicting the sexual abuse of minors. These child-safety concerns remove this case from the narrow confines of *Stanley* and outweigh whatever interest Anderegg may have in keeping a collection of obscene, sexually explicit images of virtual children in his home. *See Ferber*, 458 U.S. at 756 ("[W]e have sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights.").

These child-safety concerns make this case much more like *Osborne* than *Stanley*. And for similar reasons that the Supreme Court held in *Osborne* that neither the First Amendment nor *Stanley* provide any right to possess "child pornography"—

21

including in the home—so should this Court hold that neither the First Amendment nor *Stanley* provide any right to the in-home possession of realistic, AI-generated obscene materials depicting children engaging in sexually explicit conduct.

c. Recent federal cases show that, like Anderegg, at least some offenders who engage with AI-generated obscene materials of children engaged in sexually explicit conduct will also commit illegal sexual activity involving real minors. In *United States v. Ostrander*, 114 F.4th 1348 (11th Cir. 2024), for example, the defendant—who had a prior federal conviction for possession of child pornography—was convicted under Section 1466A(b)(1) for possessing obscene imagery showing non-real children. *Id.* at 1355-1356. In *United States v. Bentler*, the defendant pleaded guilty to a Section 1466A(b)(1) possession count involving computer-generated materials, after having been previously convicted of New York sexual abuse in the first degree (involving a three-year-old victim) and New York attempted rape in the first degree (involving a nine-year-old). W.D.N.Y. No. 24-cr-142, Docs. 16, 30. And Anderegg himself shared obscene material with a minor and is currently being prosecuted by the State of Wisconsin for engaging in sex acts with a prepubescent minor—conduct law enforcement uncovered as a result of this federal investigation.[11]

---

[11] There are also at least two defendants with previous child-sex-crime convictions (involving actual children) who are currently being prosecuted under Section 1466A(b)(1) for offenses involving AI-generated obscene material depicting children engaged in sexually explicit conduct. *See United States v. Yeasley*, D. Idaho No. 23-cr-273, Docs. 16, 25; *United States v. Perry*, D. Idaho No. 24-cr-129, Docs. 12, 18.

2.    Application of Section 1466A(b)(1) here proscribes Anderegg's use of interstate commerce in furtherance of his possession of obscene images of children engaged in sexually explicit conduct and therefore falls outside the limited right that *Stanley* protects.

There is another feature that meaningfully distinguishes this case from *Stanley*: Anderegg's possession had a nexus with interstate commerce, whereas the defendant in *Stanley* was guilty of "mere private possession of obscene matter" in his home with no requirement of any such nexus. *Stanley*, 394 U.S. at 558-559 & n.1, 568.

a. "[C]ommerce in obscene material is unprotected by any constitutional doctrine of privacy," *Paris Adult Theatre*, 413 U.S. at 69, and *Stanley*'s "holding did not prohibit the government from regulating the channels of commerce," *Whorley*, 550 F.3d at 332 (rejecting *Stanley* challenge to receipt conviction under 18 U.S.C. § 1462). In a series of cases decided shortly after *Stanley*, the Supreme Court held that *Stanley* does not apply to the transportation, receipt, distribution, or importation of obscene material, even if those acts are done in furtherance of private, in-home possession, and that the government "retain[s] broad power to regulate obscenity," *Stanley* notwithstanding. *See, e.g.*, *Smith*, 431 U.S. at 307; *12 200-Foot Reels*, 413 U.S. at 128; *United States v. Orito*, 413 U.S. 139, 141 (1973); *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 376 (1971) (plurality op.); *United States v. Reidel*, 402 U.S. 351, 354-355 (1971); *see also Stanley*, 394 U.S. at 568. In fact, as far as the government is aware, every time the Supreme Court has addressed whether *Stanley* applies to an offender's use of commerce to engage with obscene

23

content, the Court has held that it does not. This limitation on *Stanley*'s reach stands in stark contrast to the district court's more expansive interpretation.

Consistent with this precedent, three courts have held that Section 1466A(b)'s interstate-commerce element, specifically including subsection (d)(4), renders *Stanley* inapposite. *United States v. Mees*, 2009 WL 1657420, at *4 (E.D. Mo. June 10, 2009) ("[Section 1466A(b)(1)] does not make mere possession of obscene material a crime; rather, the statute requires some connection to interstate commerce. Defendant is not being charged with mere possession of obscene material; he is charged with possessing obscene material that was produced using materials that traveled in interstate commerce."); *United States v. Handley*, 564 F.Supp.2d 996, 1001 (S.D. Iowa 2008) ("[W]hile an individual has a limited right to possess obscene materials in the privacy of his own home, there exists no right to receive or possess obscene materials that have been moved in interstate commerce, and that is the illegal conduct with which Defendant is charged."); *see also United States v. Taylor*, 2016 WL 787245, at *6-*7 (A.F. Ct. Crim. App. 2016).

b. Section 1466A(b)(1) applies only if one of the interstate-commerce "circumstance[s] described in subsection" (d)(1)-(4) is satisfied, or if the offense took place in the special maritime and territorial jurisdiction of the United States or in a United States territory or possession. 18 U.S.C. § 1466A(b)(1), (d)(1)-(5). The possession count here, for example, charged under Section 1466A(d)(4) that "any visual depiction involved in the offense had been shipped and transported in interstate and foreign commerce by any means, including by computer, and was

produced using materials that had been mailed, and that had been shipped and transported in interstate and foreign commerce by any means, including by computer." App. 23-24. Accordingly, Section 1466A(b)(1) as applied here does not—and could not—criminalize Anderegg's mere possession of obscene material in his home. Instead, it criminalizes Anderegg's use of interstate commerce to come into possession of obscene and sexually explicit images of children.[12]

This matters. *Stanley* involved, and was about, "mere possession" in the privacy of one's own home, *Stanley*, 394 U.S. at 559, 564-565, 568; *see Smith*, 431 U.S. at 306—not commerce. And *Stanley* made clear, repeatedly, that the First Amendment right announced there extended only to "mere private possession of obscene material" in one's home. *Stanley*, 394 U.S. at 568; *see id.* at 559, 560-561, 564, 567. But Section 1466A(b)(1) does not reach "mere private possession." Instead, it only reaches possession of obscene (and non-First-Amendment-protected) depictions of minors engaging in sexually explicit conduct where that possession is connected with interstate commerce, as Anderegg's was. Section 1466A(b)(1) therefore applies to circumstances that *Stanley* does not insulate.

In addition, Section 1466A(b)'s interstate-commerce element reinforces the child-protection rationales discussed above. "[T]he government has a legitimate interest in protecting the public commercial environment by preventing such material [*i.e.*, obscene material] from entering the stream of commerce." *Orito*, 413 U.S. at 143.

---

[12] At trial, the government intends to prove that the computer that Anderegg used to produce and possess his imagery had traveled in interstate commerce and that he had downloaded Stable Diffusion from the internet to create those images.

This, in turn, dovetails with the "well-settled principle that Congress may impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral or economic nature." *Id.* at 144 (internal quotation marks omitted). Relatedly, and as discussed *supra* at 19-20, the government has a compelling interest in regulating the in-home possession of obscene material depicting minors engaging in sexually explicit conduct as a means of helping "destroy a market for the exploitative use of children." *Osborne*, 495 U.S. at 109 (discussing Ohio's child-pornography statute); *see generally Angle*, 234 F.3d at 337-338.

### D.    The district court's decision is unpersuasive.

Despite the Supreme Court's repeated statements that *Stanley* is a narrow decision that applies narrowly, the district court expanded *Stanley* multiple times over in dismissing the Section 1466A(b)(1) count here. First, the court expanded *Stanley*'s holding on adult obscenity to cover Anderegg's possession of obscene images that not only depict children, but that depict children engaging in sexually explicit conduct, and then relied on this overreading to discount the government's legitimate and compelling interest in regulating the possession of such material to protect minors from sexual exploitation. Second, the court expanded *Stanley* to cover Anderegg's possession of obscene images of children with a connection to commerce— which goes beyond the "mere possession" in the home at issue in *Stanley*. And on top of these *Stanley* issues, the district court misread *Free Speech Coalition* and consequently undervalued the compelling child-safety interests at stake here.

26

1. As noted above, *Stanley* is a "narrow" decision that "should not be read too broadly," *Osborne*, 495 U.S. at 108, and the Supreme Court has "limited" *Stanley* "severely," *Andersson*, 803 F.2d at 906. In keeping with this direction, *Stanley* is best read as applying only to obscene materials depicting adults—not children (real or AI-generated) engaging in sexually explicit activity. Any broader application would stretch too far "the explicitly narrow and precisely delineated privacy right on which *Stanley* rests." *12 200-Foot Reels*, 413 U.S. at 127.

a. The Supreme Court has repeatedly cautioned that its opinions must be read in the context of the issue presented for resolution and that doing otherwise risks applying the opinion to facts and issues not fully considered (if they were considered at all). *See, e.g.*, *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023); *Armour & Co. v. Wantock*, 323 U.S. 126, 132-133 (1944); *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 399 (1821) (Marshall, C.J.); *United States v. Ker Yang*, 799 F.3d 750, 755 (7th Cir. 2015); *see also Ameur v. Gates*, 759 F.3d 317, 324 (4th Cir. 2014) (rejecting "broadest-possible-reading approach" to Supreme Court precedent). The Supreme Court has similarly made clear that "respect for past judgments also means respecting their limits." *Brown v. Davenport*, 596 U.S. 118, 141 (2022).

In extending *Stanley* to obscene depictions of children engaged in sexually explicit conduct, where that possession has a connection with interstate commerce, the district court contravened this precedent. Properly understood, *Stanley* is limited to the only issue that the Court there actually considered: whether the First Amendment protects the mere in-home possession of obscene material showing

27

adults. *Stanley* did not involve the possession of obscene depictions of children—real or not—engaging in sexually explicit conduct or, really, the welfare of children at all. *Cf. Stanley*, 394 U.S. at 565 (issue in *Stanley* was principally about the state's asserted "right to protect the individual's mind from the effects of obscenity"); *see Osborne*, 495 U.S. at 109. *Stanley* cannot fairly be read to grant Anderegg a First Amendment right to use interstate commerce to possess realistic, obscene, AI-generated images of children engaging in sexually explicit conduct. The district court's broadest-possible-reading of *Stanley*—applying a decision about possession of adult obscenity solely within the home to invalidate a charge predicated on possession of child obscenity depicting children engaged in sexually explicit conduct, and connected to interstate commerce—was wrong. The district court here, like courts in other obscenity cases before it, "gave *Stanley* too wide a sweep." *Reidel*, 402 U.S. at 355.

Indeed, the Supreme Court made clear roughly 13 years after *Stanley* that the compelling need to protect minors from sexual exploitation entitles the government "to greater leeway in the regulation of pornographic depictions of children," and the Court has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *Ferber*, 458 U.S. at 756-757; *see Vincent*, 167 F.3d at 431 ("The Constitution offers less protection when sexually explicit material depicts minors rather than adults."); *United States v. Knox*, 32 F.3d 733, 750 (3d Cir. 1994) ("To vindicate the compelling government interest in protecting the safety and

welfare of children, not only is the spectrum of constitutionally unprotected pornographic material broader when the subjects are children rather than adults, but also the arsenal of available enforcement mechanisms is more extensive."). The district court's extension of *Stanley* to Anderegg's obscene images of children therefore resulted in precisely the kinds of problems associated with over-reading opinions that the Supreme Court has repeatedly warned against.[13] Obscene materials showing children engaging in sexually explicit conduct, especially where an individual uses interstate commerce in furtherance of the possession of such images, presents a much different question, with much different stakes and equities, than the mere in-home possession of obscene materials showing adults. But there is no indication in *Stanley* that the Court "investigated" that separate child-obscenity-plus-commerce question at all, much less that the Court "completely investigated" it, *Cohens*, 19 U.S. at 399-400; nor is there any hint that *Stanley* "consider[ed]" the "quite different circumstance[]" of child obscenity, *Turkiye Halk Bankasi*, 598 U.S. at 278 (quotation marks omitted). Applying *Stanley* here was therefore a mistake. *Osborne*, 495 U.S. at 110 (*Stanley*'s rejection of the state's argument that criminalizing possession would help prevent distribution "must be viewed in light of the weak interests asserted by the State in that case").[14]

---

[13] A statute that uses the term "obscene materials" without specifying whether the materials show minors or adults might reasonably be read as applying to obscene materials depicting minors. But the "language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373 (2023) (quotation marks omitted).

[14] Fundamentally, then, the district court erred in rejecting the argument that the content of the material—whether the material shows obscene images of adults, or obscene images of children engaging in sexually explicit conduct—matters. Had the obscene material at issue

b. In keeping with this understanding, the Supreme Court has described *Stanley* as applying to obscene material "involving adults." *Williams*, 553 U.S. at 288-289 (*Stanley* held that the government "may not criminalize the mere possession of obscene material involving adults"). So have multiple federal courts of appeals. *See United States v. Morales-de Jesus*, 372 F.3d 6, 18 n.10 (1st Cir. 2004) (*Stanley* held "that states cannot regulate the private possession of adult obscenity"); *Vincent*, 167 F.3d at 431 (*Stanley* "held states cannot criminalize possession of obscenity involving adults"); *Knox*, 32 F.3d at 750 (citing *Stanley* and *Osborne* and noting that "the mere possession of child pornography, even in one's home, may be criminalized although only distribution of obscenity depicting adults can be proscribed"); *United States v. Kussmaul*, 987 F.2d 345, 350 n.5 (6th Cir. 1993) (*Stanley* applies to "sexually explicit material featuring adults"); *United States v. Richardson*, 856 F.2d 644, 648 (4th Cir. 1988) ("In *Stanley*, the Court found that the first amendment protected private possession of obscene adult material in the home.").[15]

Significantly, *Stanley* itself contains narrowing language. In addition to limiting

---

in *Stanley* depicted the sexual abuse of children, Georgia may well have proffered a different, more child-focused defense of its law, and the Supreme Court's analysis may have come out differently.

[15] In other instances, the Supreme Court and this Court have described *Stanley* without the depicting-adults limitation. *See, e.g.*, *Reidel*, 402 U.S. at 354; *United States v. Thoma*, 726 F.2d 1191, 1198 (7th Cir. 1984). In *Thoma*, this Court affirmed the defendant's convictions for mailing, for the purpose of sale, obscene material depicting actual children engaged in sexually explicit conduct. 726 F.2d at 1193-1201. In so doing, the Court suggested that *Stanley* would have protected the in-home possession of that material. *Id.* at 1198. But insofar as the defendant was not convicted of possessing that material in his home, that language was dicta. *Cf. Andersson*, 803 F.2d at 907 & n.3 (stating, post-*Thoma*, that it is "not clear to this Court" that *Stanley* applies to the in-home possession of child pornography). And in any event, *Thoma* (and *Andersson*) predated the Supreme Court's decision in *Osborne*, which held that *Stanley* does not protect the in-home possession of child pornography.

its holding to "mere" in-home possession, the Court made clear that it did not "mean to express any opinion on statutes making criminal possession of other types of printed, filmed, or recorded materials," and that "[i]n such cases, compelling reasons may exist for overriding the right of the individual to possess those materials." *Stanley*, 394 U.S. at 568 n.11; *see Osborne*, 495 U.S. at 110 & n.5. This case presents precisely such a compelling reason.

2. The district court also misinterpreted *Free Speech Coalition* and, as a result, improperly discounted the compelling child protection interests at issue here.

a. *Free Speech Coalition* involved a First Amendment challenge to a statutory definition of "child pornography," then set forth at 18 U.S.C. § 2256(8)(B), that reached material that neither showed an actual child nor was obscene. *See* 535 U.S. at 240 (question involved whether the First Amendment allows Congress to "proscribe[] a significant universe of speech that is neither obscene under *Miller* nor child pornography under *Ferber*"); *id.* at 246, 249; *see United States v. Peel*, 595 F.3d 763, 770 (7th Cir. 2010). The issue in *Free Speech Coalition* was whether the Court should create "an additional category of unprotected speech"—*i.e.*, *non-obscene* depictions of *non-real children* engaged in sexually explicit conduct. *Free Speech Coalition*, 535 U.S. at 245-246. And in the context of that type of imagery—non-obscene imagery that showed no actual child—the Court concluded that the government's child-protection rationales were insufficient to justify regulating what the Court determined was otherwise protected speech. *Free Speech Coalition*, 535 U.S. at 249-256.

This case does not present that concern. Unlike Section 2256(8)(B), Section 1466A(b)(1) explicitly requires proof that the material "is obscene." *Free Speech Coalition*'s weighing of the government's child-protection arguments therefore does not answer the question of how those arguments affect the application of Section 1466A(b)(1) to Anderegg's in-home possession, and the district court erred in concluding otherwise. As multiple courts of appeals have held, Section 1466A(b)'s obscenity element obviates any problem with the statute under *Free Speech Coalition*. *See Arthur*, 51 F.4th at 568-569; *Whorley*, 550 F.3d at 335-337; *Schales*, 546 F.3d at 971-972.

This case, therefore, differs from *Free Speech Coalition* in that application of Section 1466A(b)(1) to Anderegg does not require the creation of a new category of unprotected speech. Section 1466A(b)(1) applies only to speech—obscenity—that is already, and has long been, outside the First Amendment's protection.

b. The district court's *Free Speech Coalition* discussion is unpersuasive for the separate reason that the court did not account for the many technological and other relevant changes that have taken place in the 23 years since *Free Speech Coalition*.[16]

For example, the court discounted (App. 17-18) the government's concern—which animated the enactment of Section 1466A in the first place—that the increasingly realistic-nature of computer-generated imagery will make it more difficult to prosecute offenders who possess material showing actual children, noting *Free Speech*

---

[16] Just one year after *Free Speech Coalition*, Congress noted that "[t]he technology will soon exist, if it does not already, to computer generate realistic images of children." Pub. L. 108-21, § 501(5). As discussed above, that technology now exists, and Anderegg employed it.

*Coalition*'s skepticism of a similar argument that the government made then. *See Free Speech Coalition*, 535 U.S. at 254-255; *see also See* Pub. L. 108-21, § 501(9)-(14). But time—and the very images that Anderegg created and possessed—has shown that this concern is real and is becoming increasingly acute. *See supra* at 16-17; *see generally Free Speech Coalition*, 535 U.S. at 259-260 (Thomas, J., concurring). And the government does not have to first forgo or lose prosecutions before using Section 1466A(b)(1) in cases like this. *See supra* at 17.

Relatedly, if *Stanley* were held to immunize the in-home possession of imagery like Anderegg's, offenders could avoid prosecution by using AI to manipulate images of actual children to make the child unidentifiable or appear computer-generated. *See* Pub. L. 108-21, § 501(5); Shehan Testimony, *supra*, at 4, 6. The threat to real children is here, and it is grave.

3. The district court's rejection of the government's interstate-commerce argument is also unpersuasive. First, the court stated (App. 19) that "the obscene materials in *Stanley* (reels of eight-millimeter film) almost certainly moved in interstate commerce too." Maybe. But because the Georgia statute did not require a nexus with interstate commerce, *Stanley*, 394 U.S. at 558 n.1; App. 19, the Court's opinion did not discuss the issue or assess whether a defendant's use of interstate commerce in furtherance of in-home possession would have changed the result.

The district court also stated (App. 19) that "[i]f the jurisdictional element [in Section 1466A(d)(4)] were enough to overcome *Stanley*, *Stanley* would be a dead letter." But that is wrong. On the government's reading, *Stanley* remains fully viable,

33

it is just—as the Supreme Court has itself described *Stanley*—"narrow," *Osborne*, 495 U.S. at 108; "precisely delineated," *12 200-Foot Reels*, 413 U.S. at 127; and appropriately cabined to material showing adults where no connection with commerce is required.

4. The district court's reliance (App. 19) on the Eleventh Circuit's decision in *Ostrander* is misplaced. In *Ostrander*, the defendant was convicted of possessing obscene computer-generated images of children engaging in sexually explicit conduct, in violation of 18 U.S.C. § 1466A(b)(1). 114 F.4th at 1355. But Ostrander possessed these images in a supermarket—not the home—and the relevant issue on appeal involved a *Stanley*-based facial overbreadth challenge to Section 1466A(b)(1). *Id.* at 1355, 1359.

In the course of rejecting that challenge, the court stated that "the First Amendment protects the private possession in one's own home of obscene material depicting *virtual* minors, so long as no real children are victimized." *Ostrander*, 114 F.4th at 1361. But the court's opinion as a whole makes it unclear whether this language was intended as a definitive statement of the law. *See id.* at 1355 (noting that "any *potentially* unconstitutional reach of the statute" is not enough to render the statute facially overbroad (emphasis added)); *id.* at 1359-1360 (referencing Ostrander's *Stanley* argument and stating that Section 1466A(b)(1) "proscribes some conduct that *may be* constitutionally protected" (emphasis added)); *id.* at 1362 (rejecting constitutional challenge "*even if* Ostrander has established overbreadth" (emphasis added)); *id.* at 1364 (referencing "*arguably* impermissible applications of

the statute" (emphasis added) (quotation marks omitted)). This all makes sense, because resolution of Ostrander's overbreadth challenge did not require the Eleventh Circuit to definitively resolve whether *Stanley* applies to a Section 1466A(b)(1) charge involving in-home possession. Accordingly, even if the court did make a definitive determination about *Stanley*, that statement is dicta. And that dicta about the reach of *Stanley* is wrong for all of the reasons discussed above.

*      *      *

*Stanley* differs from this case in all the ways that matter. *Stanley* involved adult obscenity; the state defended the statute on the "weak" and "paternalistic" desire to protect the mind of the adult possessor; and the state statute did not require that the possession had a connection with interstate commerce. Here, in contrast, Section 1466A(b)(1) applies only to obscene depictions of children, and more specifically still, of children engaging in sexually explicit conduct; the statute, even as applied to in-home possession, is a necessary tool to advance the government's compelling interest in keeping children safe from real sexual harm; and Section 1466A(b)(1) only applies here because Anderegg used interstate commerce to possess his obscene, sexually explicit images of children.

These differences—combined with the Supreme Court's general admonitions to avoid reading its precedent too broadly; the Court's specific, repeated, narrow interpretations of *Stanley*; and the Court's post-*Stanley* precedents—all point in the same direction: the district court's expansive reading of *Stanley* was wrong.

## CONCLUSION

The Court should reverse the dismissal of Count 4.

                           Respectfully submitted,

                           MATTHEW R. GALEOTTI
                             Head of the Criminal Division

                           JOSH A. GOLDFOOT
                             Deputy Assistant Attorney General

                           <u>s/ ROSS B. GOLDMAN</u>
                           ROSS B. GOLDMAN
                           WILLIAM G. CLAYMAN
                             Criminal Division
                             Child Exploitation & Obscenity Section
                             U.S. Department of Justice
                             1301 New York Ave. NW
                             Washington, DC 20530
                             (202) 532-4153

May 14, 2025

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) and Seventh Circuit Rule 32 because the brief contains 9,422 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements set forth in Federal Rule of Appellate Procedure 32(a)(5) and Seventh Circuit Rule 32 and the type-style requirements set forth in Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 12-point Century Schoolbook font, with 11-point Century Schoolbook font in footnotes.

<u>s/ Ross B. Goldman</u>

No. 25-1354

# In The United States Court Of Appeals For The Seventh Circuit

———————

UNITED STATES OF AMERICA,

Appellant,

v.

STEVEN ANDEREGG,

Defendant-Appellee.

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN, NO. 24-CR-00050
(HON. JAMES D. PETERSON, U.S. DISTRICT JUDGE)

———————

## SHORT APPENDIX OF THE UNITED STATES

———————

MATTHEW R. GALEOTTI
    Head of the Criminal Division

JOSH A. GOLDFOOT
    Deputy Assistant Attorney General

ROSS B. GOLDMAN
WILLIAM G. CLAYMAN
    Criminal Division
    Child Exploitation & Obscenity
        Section
    U.S. Department of Justice
    1301 New York Ave. NW
    Washington, DC 20530
    (202) 532-4153

## TABLE OF CONTENTS

District Court Order (Feb. 13, 2025)................................................... App. 1

Indictment (May 15, 2024) ............................................................. App. 22

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

                              Plaintiff,                      OPINION and ORDER

          v.
                                                             24-cr-50-jdp
STEVEN ANDEREGG,

                              Defendant.

---

Defendant Steven Anderegg is charged with four counts relating to what the court will refer to as obscene virtual child pornography. Anderegg moves to dismiss each of the four counts, Dkt. 40 and Dkt. 41, to suppress the evidence gathered from two search warrants, Dkt. 39, for a *Franks* hearing, Dkt. 50, and for a few other items of miscellaneous relief.

Anderegg isn't charged with the production, distribution, or possession of child pornography as that term is used under federal law, because the charged images at issue aren't of real children. Rather, they were generated through Stable Diffusion, AI software that generates images in response to text prompts. The charges here rely on the theory that the images constitute obscenity, which generally lies beyond the scope of the First Amendment. *Roth v. United States*, 354 U.S. 476, 492 (1957). But the First Amendment generally protects the right to possess obscene material in the home, *Stanley v. Georgia*, 394 U.S. 557 (1969), so long as it isn't actual child pornography, *Osborne v. Ohio*, 495 U.S. 103, 111 (1990). These basic principles guide much of the analysis that follows.

The court will deny Anderegg's motions to suppress evidence from the search warrants, because the warrant application described the images and the context in which they were found with enough detail to establish probable cause for obscenity offenses. The court will dismiss

the possession-of-obscenity charge following *Stanley*, but it will deny the motions to dismiss the other counts for reasons explained below.

BACKGROUND

Through the National Center for Missing and Exploited Children's CyberTipline, law enforcement received tips from Instagram about a user sharing with a 15- or 16-year-old boy two AI-generated images of nude boys. The sharing occurred in early October 2023. A Wisconsin Department of Justice special agent investigated. The tips included an Instagram chat conversation between the user and the boy in which the user described how he created images using Stable Diffusion, software that generates images from text-based prompts.

After issuing an administrative subpoena to Charter Communications, law enforcement learned that the Internet Protocol (IP) address linked to the Instagram account activity was assigned to defendant Steven Anderegg. The United States Attorney sought a search warrant for the Instagram accounts associated with Anderegg, supported by an affidavit from the special agent; Magistrate Judge Stephen Crocker issued that warrant. *See* Dkt. 52-1.

Review of the Instagram accounts revealed a third apparently AI-generated image of naked boys, as well as sexually explicit chats with minors. The United States Attorney sought a second search warrant, this time for Anderegg's home in Holmen, Wisconsin, and his vehicles. This warrant was also supported by an affidavit from the special agent. *See* Dkt. 52-2. Magistrate Judge Crocker issued that warrant. *Id.*

Review of Anderegg's electronic devices revealed more than 13,000 AI-generated images, many of them alleged to be of children engaged in sexually explicit conduct. A federal grand jury returned an indictment for the following charges:

2

1. Production of at least one obscene image of a minor engaging in sexually explicit conduct (between Oct. 20 and Dec. 28, 2023); 18 U.S.C. § 1466A(a)(1) and (d)(1).

2. Distribution of at least one obscene image of a minor engaging in sexually explicit conduct (on October 7, 2023); 18 U.S.C. § 1466A(a)(1) and (d)(1).

3. Transfer of obscene matter to an individual under 16 (on October 7, 2023); 18 U.S.C. § 1470.

4. Possession of at least one obscene image of a minor engaging in sexually explicit conduct (between Oct. 20, 2023, and Feb. 22, 2024); 18 U.S.C. § 1466A(b)(1) and (d)(1).

Dkt. 2.


ANALYSIS

**A.  Motions to suppress**

Anderegg moves to suppress the evidence gathered from both search warrants, contending that they did not establish probable cause of criminal activity. Anderegg argues that the warrant applications' description of the allegedly obscene images wasn't detailed enough for Magistrate Judge Crocker to properly determine whether the images were obscene. He also argues that the warrant applications didn't properly link the CyberTipline-reported Instagram account to him or his residence.

A search warrant is valid under the Fourth Amendment only if issued with probable cause. "To establish probable cause, a warrant application must contain facts that, given the nature of the evidence sought and the crime alleged, allow for a reasonable inference that there is a fair probability that evidence will be found in a particular place." *United States v. Roland*, 60 F.4th 1061, 1064 (7th Cir. 2023). "[P]robable cause is far short of certainty—it 'requires only a probability or substantial chance of criminal activity, not an actual showing of such

3

activity . . . .'" *United States v. Seiver*, 692 F.3d 774, 777 (7th Cir. 2012) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)). It's "not a probability that exceeds 50 percent ('more likely than not'), either." *Id.* (quoting *Hanson v. Dane Cnty., Wis.*, 608 F.3d 335, 338 (7th Cir. 2010). This "is a flexible, common-sense, totality-of-the-circumstances standard." *United States v. Schenck*, 3 F.4th 943, 946 (7th Cir. 2021).

A reviewing court owes "great deference" to the probable cause conclusion of the judge who issued the search warrant, and the court must "uphold a finding of probable cause so long as the issuing judge had a substantial basis to conclude that the search was reasonably likely to uncover evidence of wrongdoing." *United States v. Reichling*, 781 F.3d 883, 886 (7th Cir. 2015) (quotation omitted), *cert. denied*, 577 U.S. 878 (2015).

### 1.  Elements of obscenity

The warrant applications listed potential charges against Anderegg including production, possession, and distribution of obscene images of the sexual abuse of children, possession and distribution of child pornography, importation or transportation of obscene matters, and transfer of obscene matters to minors. Anderegg focuses on whether the warrant-application affidavits were specific enough to make a probable cause finding either (1) that the images were obscene; or (2) tying Anderegg's residence to the Instagram account.

The court starts with whether there was probable cause that the images were obscene. A preliminary question is whether search warrants in obscenity cases demand higher scrutiny than those in child pornography cases or other types of cases. The parties ultimately agree that the standard articulated under *New York v. P.J. Video, Inc.*, 475 U.S. 868 (1986), controls. Under *P.J. Video*, a "warrant authorizing the seizure of materials presumptively protected by the First Amendment may not issue based solely on the conclusory allegations of a police officer that

4

the sought-after materials are obscene." *Id.* at 873. Rather, a supporting affidavit must "set[] forth specific facts" so that "the issuing magistrate may 'focus searchingly on the question of obscenity.'" *Id.* at 873–74 (quoting *Marcus v. Search Warrants of Prop. at 104 E. Tenth St., Kansas City, Mo.*, 367 U.S. 717, 732 (1961)). The probable cause standard itself remains unchanged from the ordinary standard. *Id.* at 875 ("an application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally").

Anderegg argues that search warrant applications didn't give enough detail about the images for Magistrate Judge Crocker to "focus searchingly on the question of obscenity." To be considered obscene, works must:

1. when taken as a whole, appeal to the prurient interest in sex;

2. portray sexual conduct in a patently offensive way; and

3. when taken as a whole, not have serious literary, artistic, political, or scientific value.

*Miller v. California*, 413 U.S. 15, 24 (1973).

The warrant applications did not include the images themselves; they relied on the special agent's description of three transmitted images. Anderegg contends that the best practice would be for the government to produce the images along with the warrant application. *See also United States v. Griesbach*, 540 F.3d 654, 656 (7th Cir. 2008) ("The failure of the state investigator to submit the image itself with her affidavit to the state judge is the strangest thing about this case . . . ."). But there is no *requirement* that the judge considering the warrant see the material firsthand. *P.J. Video*, 475 U.S. at 874 n.5 ("[W]e have never held that a magistrate must personally view allegedly obscene films prior to issuing a warrant authorizing their seizure.").

So the issue boils down to whether the special agent's affidavits allowed Magistrate Judge Crocker to "focus searchingly on the question of obscenity." The special agent's affidavits described the three images as follows:

> This image depicted what appeared to be a prepubescent juvenile male kneeling on a blue blanket in a wooded area. The male was partially clothed, only wearing a baseball cap and white underwear. The male had his erect penis exposed through the opening in his underwear. In the background of the image were other clothed, pre or young pubescent children. The male was posed in a manner that made his erect penis the focal point of the image. This image appears to be computer-generated content.

Dkt. 52-1, at 11.

> This image depicted what appeared to be a different prepubescent juvenile male kneeling on a blue blanket in a wooded area leaning back on his hands with his legs spread far apart exposing his erect penis. The male had a blue cloth draped across his stomach, but other than that, was completely nude. There was a partially clothed juvenile female with brown hair kneeling to the left of the male looking over his shoulder at him. The male in this image was posed in a manner that made his penis the focal point of the image. This image appears to be computer-generated content.

*Id.*

> This third image depicted what appeared to be three prepubescent boys standing in a row in a wooded area. The boys are all shirtless and wearing tiny shorts. The boy on the left has his erect penis sticking out of his shorts. The boy on the right has his shorts zipped down to expose his penis, which the boy in the middle appears to be gripping with his hand. The boys are clearly intended to be prepubescent based on their small statures, underdeveloped physiques, and youthful facial features.

Dkt. 52-2, at 34–35.

These descriptions are succinct but they are not conclusory. Anderegg argues that the affidavits supporting the warrant in *P.J. Video* contained more detail about sex acts in the movie

6

that was at issue there. But at least part of the reason for that is that there's less material here: rather than the 90-minute movies at issue in *P.J. Video*, the material here is three images.

Anderegg states that "from those vague descriptions, we don't even have a sex act being displayed. We have nudity, which is not obscene . . . ." Dkt. 52, at 32. He also states, "All the court had was that in each image a minor's penis was exposed—erect in two, and gripped in a third." *Id.* at 38. But this is not mere nudity. The "lewd exhibition of the genitals" is specifically cited in *Miller's* list of examples of material that could be regulated as obscenity. 413 U.S. at 25; *see also, e.g.*, *United States v. Salcedo*, 924 F.3d 172, 179 (5th Cir. 2019) (concluding that image prominent displaying adult erection "was a patently offensive, lewd exhibition of the genitals."); *United States v. Rogers*, 474 F. App'x 463, 470 (7th Cir. 2012) ("A jury could reasonably find that the picture [of an adult's erect penis protruding out of a pair of unzipped pants being held by a hand] represented or described a lewd exhibition of his genitals."). That the penises are erect or gripped moves the images beyond mere nudity. And the special agent's description that the images are of prepubescent children is another factor that supports the conclusion that the display of genitals would be prurient and patently offensive. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 240 (2002) ("[W]e may assume that the apparent age of persons engaged in sexual conduct is relevant to whether a depiction offends community standards. Pictures of young children engaged in certain acts might be obscene where similar depictions of adults, or perhaps even older adolescents, would not."). The affidavits' descriptions of the images were enough for Magistrate Judge Crocker to conclude that there was a fair probability that the pictures depicted patently offensive sexual conduct.

Anderegg also argues that the descriptions weren't enough for Magistrate Judge Crocker to adequately consider whether the images had serious artistic value. Anderegg supports his

argument by juxtaposing works by well-known artists with AI-generated photo-realistic versions of those works (William-Adolphe Bouguereau's *The Birth of Venus*, Balthus's *The Guitar Lesson*, and a photograph of a nude boy by Robert Mapplethorpe). Then, Anderegg proposes short written descriptions of those images, similar in detail to the special agent's descriptions of the images at issue here. Anderegg argues, "All of the serious value is lost when the description is so vague and the image isn't shown." Dkt. 52, at 31.

The court is not persuaded by this argument about artistic value. The warrant application did not have to eliminate any possibility that the transmitted images lacked serious artistic value. The probable cause standard requires only enough to make it "reasonably likely" that the images lacked serious artistic value. Law enforcement isn't required to draft a warrant application that establishes illegality to a dead certainty.

In this case, the context of the images tends to negate the possibility of serious artistic value. The search warrant wasn't directed to an art gallery, a movie theater, or even a private collection of art. The targeted Instagram user created the images after soliciting ideas from a minor during an online chat. Anderegg states that communicating with a 15-year-old "is not illegal—true, it's not a good idea, but it's not illegal." Dkt. 52, at 35. But Magistrate Judge Crocker could use that context in his calculus of the artistic value of the images; the context shows a strong likelihood that Anderegg wasn't using the images for any artistic or scientific purpose. *See Rogers*, 474 F. App'x at 470 ("Rogers did not send the image to engage Emily in scientific discussion on human anatomy or an academic discourse on teenage sexual activity."); *see also Free Speech Coal.*, 535 U.S. at 257–58 ("The Court has recognized that pandering may be relevant, as an evidentiary matter, to the question whether particular materials are obscene."). The court rejects Anderegg's argument that the warrants should be quashed because

the warrant applications provided no information about whether the images lacked serious artistic value.

Anderegg doesn't explicitly argue the "appeals to the prurient interest in sex" element of obscenity, but for the sake of completeness the court will address it. The court must consider the work as a whole and it may also consider the context in which it was created or distributed. *Cf. id.* at 258 ("Where a defendant engages in the 'commercial exploitation of erotica solely for the sake of their prurient appeal,' the context he or she creates may itself be relevant to the evaluation of the materials." (citation omitted) (quoting *Ginzburg v. United States*, 383 U.S. 463, 466 (1966)). Here, the description of the images' focus on boys' genitals, other children peering at the boys' genitals (and in one case gripping another boy's penis), and the context in which the Instagram user created and shared them with a minor are sufficient to meet the probable cause requirement on this element. *See Rogers*, 474 F. App'x at 469 ("Rogers' attempt to foist upon Emily, an individual he believed to be a thirteen-year-old minor, sexually explicit material that she legally could not consent to receive constitutes a prurient interest."). The court will deny this portion of Anderegg's motion to suppress.

### 2. Nexus to Anderegg's home

Anderegg also moves to suppress evidence gathered from the second search warrant, the one for Anderegg's residence. He contends that the warrant did not tie the evidence sought with the place to be searched. *See Gates* 462 U.S. at 238 ("[T]here [must be] a fair probability that contraband or evidence of a crime will be found in a particular place."). The Instagram account (registered to an unknown person) sharing the AI images with a minor did so on October 7, 2023, from a particular IP address. There was a login to that same account using the same IP address on October 1, 2023.

**App. 9**

Law enforcement requested an administrative subpoena be issued to Charter Communications for records about the use of that IP address. But curiously, law enforcement requested the customer using that IP address at certain times on October 2 and October 8, 2023, not October 1 and October 7, 2023. Charter responded that Anderegg was assigned that IP address for the times requested on October 2 and October 8; Charter also listed his Holmen address, the place targeted by the second search warrant.

Anderegg argues that the information from Charter isn't enough to tie him to the IP address because IP addresses are dynamic and can change from day to day or even minute to minute. The court acknowledges that IP addresses can be dynamic, but Anderegg's IP address appears to have been stable during the dates at issue. Anderegg was assigned the IP address on October 2 and October 8, so there's at least a fair probability that he was assigned that same address on October 1 and October 7 too. And it wasn't just the IP address tying Anderegg to the Instagram account. The warrant application indicated that a second Instagram account with a similar username (both containing "dhyana") was registered to a person with Anderegg's phone number. And in its CyberTipline report, Meta (which owns Instagram) stated that Anderegg's registered Facebook and Instagram accounts were "linked by device and/or IP address" to the account that sent the images to the minor. Dkt. 52-2, at 31. Given the common-sense approach judges are to take in determining probable cause, Magistrate Judge Crocker had ample reason to conclude that the account was Anderegg's. The court will deny Anderegg's motion to suppress.

### 3.  Request for *Franks* hearing

Anderegg filed a separate motion to suppress and requesting a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), contending that the government falsely represented that the

persons depicted in the images described in the warrant are prepubescent minors. Anderegg's case for a *Franks* hearing is based solely on the images and the special agent's descriptions of them.

Anderegg describes the issue as follows:

> Here, the affidavit described a "prepubescent juvenile male"—that could mean a minor from ages 5–12. Yet, the image doesn't show anything close to that. It shows a *very* young face and a *very* mature body. Again, the body has strong muscular development, it has terminal hair and other body hair. All of which takes the figure to be anything but prepubescent. How old is the subject? No one knows because it's AI-generated so it exists outside of time—there's no birthday. It's a hodgepodge of parts, a young face and an older body . . . . It's AI-generated so, it's just not something that could be Tanner Scaled, and it's certainly not something that could be accurately described as "prepubescent."

Dkt. 50, at 3 (emphases in original).

To establish his entitlement to a *Franks* hearing, Anderegg's burden is to make a "substantial preliminary showing" of (1) a material falsity or omission from the warrant applications that would alter the probable cause determination; and (2) a deliberate or reckless disregard for the truth. *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014) (internal quotation omitted). "*Franks* hearings are rarely held because these elements are hard to prove." *United States v. Woodfork*, 999 F.3d 511, 516 (7th Cir. 2021).

Anderegg argues that the special agent's characterization of the main subjects of the images at issue as prepubescent is a material falsity because it's not possible to assign an age to the AI figures in the images given their features, and that Magistrate Judge Crocker would not have issued the warrants if the images were of pubescent minors.

The court disagrees on both points. First, the age of the figures is not necessarily critical to the issue of obscenity because lewd exhibition of the genitals can be obscene regardless the

11

**App. 11**

age of the figure portrayed. *See, e.g.*, *Salcedo*, 924 F.3d at 179; *Rogers*, 474 F. App'x at 470. And some of the charges don't depend on the age of the subjects featured in allegedly obscene material—notably the transfer of obscene material to minors. The warrants would have issued even had the word prepubescent been omitted.

Second, the court has reviewed the images, and the court sees nothing to suggest deliberate or reckless disregard for the truth in law enforcement's describing the main figures in those images as prepubescent. Anderegg concedes that the images "show a *very* young face." Dkt. 50 at 3 (emphasis in original). The court agrees with that characterization of the faces, which are a primary indication of age.

Anderegg contends that the figures have "a *very* mature body." He describes the full figure as "a hodgepodge of parts, a young face and an older body," and he states that "the images [don't] show anything close to" prepubescent bodies. *Id.* (emphasis in original). The court agrees that the figures are an amalgam of features, with some parts apparently older than others. But ultimately the court disagrees with Anderegg's conclusion that the figures cannot fairly be described as prepubescent.

The AI images are photorealistic in the sense that they are rendered in a style meant to look like photographs, as opposed to say a painting or drawing. But they are in other ways slightly unreal, as AI-generated images sometimes are. For instance there are some AI artifacts, such as the blurriness in the part of the third image where one boy appears to grip another's penis. And the figures are, as Anderegg says, kind of hybrids with some body parts not precisely matching the figure's faces: the size of boys' erections, the musculature, and presence of some body and pubic hair. But it isn't accurate to characterize the figures as a "hodgepodge of parts." The figures aren't a Frankenstein mashup of child and fully adult parts. The bodies may have

12

somewhat more musculature than one would expect of a prepubescent boy, but the bodies are all slender and youthful. The figures are rendered in a cohesive, realistic looking way despite some incongruities. The court concludes that Anderegg has not made a substantial preliminary showing of any material falsity or omission in the agent's description of the images or that the agent deliberately or recklessly disregarded the truth. The court will deny Anderegg's motion for a *Franks* hearing.

## B. Motions to dismiss

### 1. Counts 2 and 3

Anderegg moves to dismiss Count 2 (distribution of an obscene image of a minor) and Count 3 (transfer of obscene matter to a person under 16) on the ground that the images that Anderegg is accused of sending are not obscene as a matter of law.

Anderegg does not ground his motion in a particular Federal Rule of Criminal Procedure. There is no mechanism for summary judgment as is applied in the civil context. Rule 29 motions are ordinarily brought after the government closes its evidence or after the close of all the evidence. Federal Rule of Criminal Procedure 12(b)(1) states, "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." But "[a] motion to dismiss is not intended to be a 'summary trial of the evidence.'" *United States v. Yasak*, 884 F.2d 996, 1001 (7th Cir. 1989).

Nonetheless, the court takes Anderegg's argument here to be that no trial is required because the court can rule as a matter of law that the images are not obscene; he states "there is no way to consider the images that Anderegg allegedly distributed . . . and find that they are obscene materials." Dkt. 52, at 41. The government grants that "[i]t is perhaps possible that certain imagery—for example, a picture of an adult woman in a bathing suit swimming in the

ocean—would be so obviously non-obscene that a district court could dismiss an obscenity count predicated on such an image." Dkt. 64, at 29 n.12.

The court agrees that it could dismiss a count regarding an obviously non-obscene image. *See Jenkins v. Georgia*, 418 U.S. 153, 161 (1974) ("[i]t would be wholly at odds with . . . *Miller* to uphold an obscenity conviction based upon a defendant's depiction of a woman with a bare midriff"). But the court will not grant Anderegg's motion to dismiss regarding the three AI pictures transmitted to a 15-year-old. Having reviewed the images, the court concludes that the three images are not obviously outside the realm of the obscene. The court agrees with the special agent's affidavits that the boys' erect penises are the focal point of the images. Other children are depicted as gazing at those erections, and in one image, gripping another's penis. A reasonable jury could find these images to be obscene. *See, e.g.*, *Salcedo*, 924 F.3d at 179; *Rogers*, 474 F. App'x at 470. It's simply not the court's role at this point of the proceedings to decide that issue for the jury. The court will deny Anderegg's motion to dismiss Counts 2 and 3.

### 2.  Counts 1 and 4

Anderegg moves to dismiss Count 1, production of an obscene image of a minor engaging in sexually explicit conduct, 18 U.S.C. § 1466A(a)(1), and Count 4, possession of an obscene image of a minor engaging in sexually explicit conduct, 18 U.S.C. § 1466A(b)(1). With this motion, Anderegg makes a constitutional challenge to section § 1466A, which was enacted as part of the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. No. 108–21, 117 Stat. 650 (2003).

Anderegg contends that under *Stanley*, § 1466A is unconstitutional as applied to him because he has the right to possess and produce obscene material in his own home. 394 U.S.

at 568 ("We hold that the First and Fourteenth Amendments prohibit making mere private

possession of obscene material a crime."). *Stanley* is an exception to the general rule that

obscene material isn't protected by the First Amendment:

> Whatever may be the justifications for other statutes regulating
> obscenity, we do not think they reach into the privacy of one's
> own home. If the First Amendment means anything, it means that
> a State has no business telling a man, sitting alone in his own
> house, what books he may read or what films he may watch. Our
> whole constitutional heritage rebels at the thought of giving
> government the power to control men's minds.

394 U.S. at 565. Despite *Stanley*'s sweeping language, it doesn't extend to *every* type of obscene

material in the home. Under *Osborne*, the possession of child pornography—obscene and non-

obscene alike—can be criminalized.

The government contends that the *Stanley* exception doesn't apply to the possession

and production counts in this case because *Stanley* involved obscene material involving *adults*.

It argues that "the paramount importance of protecting minors from sexual exploitation entitles

the government 'to greater leeway in the regulation of pornographic depictions of children.'"

Dkt. 64, at 13 (quoting *New York v. Ferber*, 458 U.S. 747, 756 (1982)). Possession of child

pornography in one's own home can be criminalized despite *Stanley* because of the

government's compelling interest "in 'safeguarding the physical and psychological well-being

of a minor.'" *Osborne*, 495 U.S. at 109 (quoting *Ferber*, 458 U.S. at 756–57).

The government argues that § 1466A is constitutional as it applies to production and

possession of obscene virtual child pornography because *Stanley's* exception is limited to

obscene materials involving adults and because Congress has other compelling interests for

banning production and possession of this material. The government gives those rationales as

follows:

- "concern that offenders will use AI-generated obscene material depicting children in an effort to 'groom' actual minors into engaging in sexual acts."

- "concern that an offender's engagement with AI-generated obscene material depicting children will normalize the behavior and will, in turn, create increasing risk for actual children."

- "eradicating the market for materials showing the sexual exploitation of children."

- "rapid developments in AI technology are making it increasingly difficult . . . to know whether an obscene image depicts a real child or an AI-generated one . . . . creat[ing] the very real, very present risk that offenders engaged with material showing actual children will be immune from prosecution . . . . the photorealistic nature of GenAI material will adversely affect critical child-rescue efforts, as rescuers search for children who do not, in fact, exist."

Dkt. 64, at 15, 17–20.

The government's attempt to limit *Stanley* is inconsistent with *Free Speech Coalition*, 535 U.S. at 240. In *Free Speech Coalition*, the Supreme Court considered an overbreadth challenge to a precursor to the PROTECT Act, the Child Pornography Prevention Act of 1996, prohibiting child pornography that did not depict an actual child. 535 U.S. 234. The Court noted that *Ferber* "distinguished child pornography from other sexually explicit speech because of the State's interest in protecting the children exploited by the production process." The production of *virtual* child pornography doesn't directly harm children, but Congress "decided the materials threaten children in other, less direct, ways." *Id.* at 240, 241. The Court concluded that the ban on virtual pornography violated the First Amendment, for two reasons: (1) it prohibited non-obscene expression, including material potentially having significant artistic value; and (2) the government's proffered reasons (similar to the rationales the government gives above in support of §1466A) for restricting all virtual child pornography were unpersuasive.

16

The Court rejected the rationale that offenders might groom children with virtual pornography by stating, "There are many things innocent in themselves, however, such as cartoons, video games, and candy, that might be used for immoral purposes, yet we would not expect those to be prohibited because they can be misused." *Id.* at 251.

The government's proffered rationale here that an offender's use of AI-generated material would "normalize" that behavior and increase risk to children is substantially similar to the government's argument in *Free Speech Coalition* that virtual child pornography might "whet the appetite" of offenders. The Court considered that rationale and stated, "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Id.* at 253. The Court also quoted *Stanley* for the proposition that Congress "'cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts.'" *Id.* (quoting 394 U.S. at 566). It concluded that "The Government has shown no more than a remote connection between speech that might encourage thoughts or impulses and any resulting child abuse." *Id.*

*Free Speech Coalition* also rejected the rationale that criminalizing virtual child pornography was necessary to achieve the objective of eradicating the market for all child pornography. *Id.* at 254 ("We need not consider where to strike the balance [in suppressing speech related to a crime] in this case, because here, there is no underlying crime at all."). This rationale dovetails with the government's final rationale here, about modern-day virtual child pornography becoming so photorealistic that its existence hampers the ability of law enforcement to tell whether children in the images are real and to garner child pornography convictions necessitated on the children being real. The government made similar arguments in *Free Speech Coalition*, with the Court making two points. First, that "[t]he Government may

17

**App. 17**

not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter." *Id.* at 255. Second, it rejected the government's argument about the indistinguishability of virtual child pornography from that involving real children, reasoning, "If virtual images were identical to illegal child pornography, the illegal images would be driven from the market by the indistinguishable substitutes. Few pornographers would risk prosecution by abusing real children if fictional, computerized images would suffice." *Id.* at 254.

The government urges the court to limit *Stanley* and *Free Speech Coalition* to their specific contexts, and to apply *Osborne*, which approved the criminal prohibition of the possession of child pornography. The government argues that "the in-home possession and production of obscene material involving children is much more like *Osborne* than it is *Stanley*." Dkt. 64, at 16. But *Osborne* isn't on point because the images here aren't of real children. Current § 1466A narrowed the scope of prohibited material to *obscene* virtual child pornography. That avoids the overbreadth problem identified in *Free Speech Coalition*. But it doesn't address the reasoning of *Stanley*, which relies on the importance of freedom of thought and the sanctity of the home.

The government attempts to overcome *Stanley's* reasoning with the additional element of the federal charge that the images "have been shipped or transported in interstate or foreign commerce or were produced using materials that had been shipped or transported in interstate or foreign commerce." Dkt. 64, at 22. It states that "the law here reflects Congress's assessment that the defendant's possession of obscene images produced on his foreign-made laptop has a substantial effect on interstate commerce." *Id.*

The jurisdictional element doesn't meaningfully distinguish this case from *Stanley*. The upshot of the government's argument is that the First and Fourth Amendments protect private

possession of obscene materials, but only so long as they weren't produced using materials moved in interstate or foreign commerce. But the obscene materials in *Stanley* (reels of eight-millimeter film) almost certainly moved in interstate commerce too. (The jurisdictional element was not at issue in *Stanley*, because the case originated in state court and involved a state obscenity charge.) If the jurisdictional element were enough to overcome *Stanley*, *Stanley* would be a dead letter. *See also United States v. Ostrander*, 114 F.4th 1348, 1361 (11th Cir. 2024) ("But the reasoning of *Osborne* does not apply to virtual child pornography because there are no children victimized by these images. *Free Speech Coal.*, 535 U.S. at 250. . . . Therefore, the First Amendment protects the private possession in one's own home of obscene material depicting virtual minors, so long as no real children are victimized. *Id.* at 256.").

The court concludes that, following *Stanley* and *Free Speech Coalition*, the court must dismiss Count 4, the possession charge under § 1466A(b), because it is unconstitutional as applied to Anderegg's private possession of obscene virtual child pornography.

That leaves Count 1, the production charge under § 1466A(a). The *Stanley* decision explicitly discussed in-home possession only, but the Court's discussion of the First Amendment right to privacy in one's home could readily be extended to homemade production of obscene material too. Criminalizing the drawing of an obscene picture in one's own home arguably isn't compatible with *Stanley's* privacy analysis. "[Stanley] is asserting the right to read or observe what he pleases—the right to satisfy his intellectual and emotional needs in the privacy of his own home. He is asserting the right to be free from state inquiry into the contents of his library." *Stanley*, 394 U.S. at 565; *see also Ostrander*, 114 F.4th at 1362–63 ("[Defendant] has not demonstrated any realistic indication that the statute would actually be used to prosecute someone simply for making an obscene doodle in the confines of his own bedroom,

in his home. . . . The legitimate sweep of this statute is not targeting obscene doodles and legitimate works of art in progress.").

But the court will decline to extend *Stanley* to the production of obscene virtual child pornography charged here. *Stanley* was a narrow holding written against the backdrop of the longstanding general rule that obscenity is unprotected speech that the government may regulate or prohibit. *See Roth*, U.S. at 492. *Stanley* doesn't mention production, but focuses solely on possession. And even that right isn't absolute after cases such as *Osborne*, allowing the restriction of obscene material if it is child pornography. If broader protection for production of obscenity is implicit in *Stanley*, the Supreme Court hasn't recognized it over the subsequent decades. The court concludes that the private production of obscenity does not fall within the zone protected by *Stanley*. The motion to dismiss Count 1 is denied.

## C. Other motions

Anderegg moves for in camera review of the grand jury instructions to ensure that it was properly instructed on obscenity. But this argument is premised on Anderegg's position that the images supporting Counts 2 and 3 are non-obscene as a matter of law. The court has already rejected that argument. There isn't any reason to think that the grand jury was improperly instructed on the well-known elements of obscenity. The court will deny this motion.

Anderegg moves for a bill of particulars regarding Counts 1 and 4, Dkt. 43. The government contends that Anderegg is not entitled to a bill of particulars but that it will voluntarily provide him with one. The court will deny this motion as moot.

**App. 20**

Anderegg also moves to compel production of the images that are the basis for Counts 1 and 4. Dkt. 51. The court has already ordered the government to produce a shortlist of the images most relevant to those counts. Dkt. 71.

## ORDER

IT IS ORDERED that:

1.  Defendant Steven Anderegg's motion to suppress, Dkt. 39, is DENIED.

2.  Defendant's motion for a *Franks* hearing, Dkt. 50, is DENIED.

3.  Defendant's motion to dismiss Counts 2 and 3, Dkt. 41, is DENIED.

4.  Defendant's motion to dismiss Counts 1 and 4, Dkt. 40, is GRANTED in part.

5.  Defendant's motion for review of the grand jury instructions, Dkt. 42, is DENIED.

6.  Defendant's motion for a bill of particulars, Dkt. 43, is DENIED as moot.

Entered February 13, 2025.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

**App. 21**



U.S. DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

MAY 1 5 2024

FILED/REC'D
CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

v.

STEVEN ANDEREGG,

Defendant.

SEALED INDICTMENT

Case No.    24-cr-50-jdp

18 U.S.C. § 1466A(a)(1), (b)(1)
18 U.S.C. § 1470

THE GRAND JURY CHARGES:

### COUNT 1

Between on or about October 20, 2023, and on or about December 28, 2023, in the

Western District of Wisconsin, the defendant,

### STEVEN ANDEREGG,

knowingly produced at least one visual depiction that depicted a minor engaging in

sexually explicit conduct and was obscene, and attempted to do so, and any visual

depiction involved in the offense had been shipped and transported in interstate and

foreign commerce by any means, including by computer, and was produced using

materials that had been mailed, and that had been shipped and transported in interstate

and foreign commerce by any means, including by computer.

(In violation of Title 18, United States Code, Section 1466A(a)(1) and (d)(4)).

### COUNT 2

On or about October 7, 2023, in the Western District of Wisconsin, the defendant,

### STEVEN ANDEREGG,

**App. 22**

knowingly distributed at least one visual depiction that depicted a minor engaging in
sexually explicit conduct and was obscene, and any communication involved in and
made in furtherance of the offense was communicated and transported in interstate and
foreign commerce by any means, including by computer, and any means and
instrumentality of interstate and foreign commerce was otherwise used in committing
and in furtherance of the commission of the offense.

(In violation of Title 18, United States Code, Section 1466A(a)(1) and (d)(1)).

### COUNT 3

On or about October 7, 2023, in the Western District of Wisconsin, the defendant,

### STEVEN ANDEREGG,

using a facility and means of interstate commerce, knowingly transferred obscene
matter to another individual who had not attained the age of 16 years, knowing that
such other individual had not attained the age of 16 years, and attempted to do so.

(In violation of Title 18, United States Code, Section 1470).

### COUNT 4

From on or about October 20, 2023, to on or about February 22, 2024, in the
Western District of Wisconsin, the defendant,

### STEVEN ANDEREGG,

knowingly possessed at least one visual depiction that depicted a minor engaging in
sexually explicit conduct and was obscene, and any visual depiction involved in the
offense had been shipped and transported in interstate and foreign commerce by any
means, including by computer, and was produced using materials that had been

2

**App. 23**

mailed, and that had been shipped and transported in interstate and foreign commerce

by any means, including by computer.

(In violation of Title 18, United States Code, Section 1466A(b)(1) and (d)(4)).

## FORFEITURE ALLEGATION

Upon conviction of any offense alleged in Counts 1, 2, 3, or 4 this indictment,

pursuant to Title 18, United States Code, Section 1467, the defendant,

## STEVEN ANDEREGG,

shall forfeit to the United States all of his right, title, and interest in:

(1)     any obscene material produced, transported, mailed, shipped, or received

in the respective offense;

(2)     any property, real or personal, constituting or traceable to gross profits or

other proceeds obtained from the respective offense; and

(3)     any property, real or personal, used or intended to be used to commit or

to promote the commission of the respective offense.


A TRUE BILL

_____

PRESIDING JUROR

Indictment returned: 2024-05-15

_____ FOR

STEVEN J. GROCKI
Chief, Child Exploitation and Obscenity Section

3

**App. 24**

## STATEMENT THAT ALL REQUIRED MATERIALS ARE
## IN THE APPENDIX

Pursuant to 7th Cir. Rule 30(d), undersigned counsel hereby certifies that all of the materials required by 7th Circuit Rule 30(a)-(b) are included in this appendix.


<u>s/ Ross B. Goldman</u>
Counsel for the United States