# IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

STEVEN ANDEREGG,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Wisconsin
No. 3:24-cr-00050-jdp

## BRIEF OF *AMICI CURIAE*
## FIRST AMENDMENT LAWYERS ASSOCIATION AND FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION IN SUPPORT OF APPELLEE

*Of Counsel:*

H. Louis Sirkin
FIRST AMENDMENT
LAWYERS ASSOCIATION
SANTEN & HUGHES
600 Vine Street, Suite 2700
Cincinnati, Ohio 45202
(513) 721-4450
hls@santenhughes.com

Hannah Abbott
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, PA 19106
(215) 717-3473
hannah.abbott@thefire.org

Jeff Scott Olson
  *Counsel of Record*
THE JEFF SCOTT OLSON LAW FIRM, S.C.
1025 Quinn Drive, Suite 500
Waunakee, WI 53597-2502
(608) 283-6001
jsolson@scofflaw.com
Counsel for *Amici Curiae*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1354

Short Caption: United States v. Steven Anderegg

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
First Amendment Lawyers Association (FALA); Foundation for Individual Rights and Expression (FIRE)

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
The Jeff Scott Olson Law Firm, S.C.

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

         None

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

     N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

     N/A

Attorney's Signature: /s/Jeff Scott Olson      Date: August 21, 2025

Attorney's Printed Name: Jeff Scott Olson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✔] **No** [ ]

Address: 1025 Quinn Drive, Suite 500

Waunakee, WI 53597-2502

Phone Number: (608) 283-6001      Fax Number:

E-Mail Address: jsolson@scofflaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTERESTS OF *AMICI CURIAE* .................................................... 1

INTRODUCTION & SUMMARY OF ARGUMENT ............................ 4

ARGUMENT ................................................................................... 7

I.  Obscenity and Child Pornography Are Not
    Interchangeable ...................................................................... 7

    A.  *Stanley*: Labeling speech obscene does not end the
        constitutional inquiry ..................................................... 9

    B.  *Ferber* and *Osborne*: The involvement of an actual
        child alters the standard. .............................................. 11

    C.  *Free Speech Coalition*: "Close enough" is not
        enough for the First Amendment. .................................. 14

II. The Government Fails to Assert an Interest That Would
    Justify Narrowing *Stanley* ................................................ 17

    A.  The government arguments rejected in *Free
        Speech Coalition* are equally unavailing here. ............. 17

    B.  Under *Stanley*, the government may not prosecute
        private possession of obscenity for the purpose of
        punishing or preventing bad thoughts. .......................... 23

CONCLUSION ............................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*A Book Named "John Cleland's Memoirs of a Woman of Pleasure"*
*v. Att'y Gen. of Com. of Mass.*,
383 U.S. 413 (1966) ........................................................ 8, 25

*Am. Amusement Mach. Ass'n v. Kendrick*,
244 F.3d 572 (7th Cir. 2001) .................................... 16, 18

*Am. Booksellers Ass'n, Inc. v. Hudnut*,
771 F.2d 323 (7th Cir. 1985) ............................ 11, 25, 27

*Ashcroft v. Free Speech Coal., Inc.*,
535 U.S. 234 (2002) ................................................ passim

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ............................................................ 8

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) ........................................................ 22

*Brown v. EMA*,
564 U.S. 786 (2011) ............................................ 6, 18, 24

*Ginsberg v. State of N. Y.*,
390 U.S. 629 (1968) ........................................................ 19

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) ............................................ 6, 19, 24

*Kohls v. Bonta*,
752 F. Supp. 3d 1187 (E.D. Cal. 2024) ........................ 25

*Marcus v. Search Warrants of Prop. at 104 E. Tenth St.,*
*Kansas City, Mo.*,
367 U.S. 717 (1961) .......................................................... 8

*Miller v. California*,
413 U.S. 15 (1973) ............................................................ 8

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) ................................................................ 6

*Mutual Film Corp. v. Industrial Comm'n of Ohio,*
236 U.S. 230 (1915) .............................................................. 19

*New York v. Ferber,*
458 U.S. 747 (1982) .................................................... passim

*Osborne v. Ohio,*
495 U.S. 103 (1990) .............................................. 12, 13, 15

*Packingham v. North Carolina,*
528 U.S. 98 (2017) ................................................................ 19

*Reno v. ACLU,*
521 U.S. 844 (1997) .............................................................. 6

*Roth v. United States,*
354 U.S. 476 (1957) ........................................................ 7, 9, 11

*Stanley v. Georgia,*
394 U.S. 557 (1969) ..................................................... passim

*United States v. Donoho,*
76 F.4th 588 (7th Cir. 2023) ............................................ 26

*United States v. Fredrickson,*
996 F.3d 821 (7th Cir. 2021) .......................................... 15

*United States v. Playboy Ent. Grp., Inc.,*
529 U.S. 803 (2000) .............................................................. 6

*United States v. Price,*
775 F.3d 828 (7th Cir. 2014) .......................................... 13

*United States v. Stevens,*
559 U.S. 460 (2010) .............................................................. 13

*United States v. Williams,*
553 U.S. 285 (2008) .............................................................. 22

## Statutes

18 U.S.C. § 1470 ............................................................... 20

U.S.S.G. § 2G2.2(b)(3)(E) ............................................... 19

## Other Authorities

Philip K. Dick,
  *The Minority Report* (1956) ................................................ 26

**INTERESTS OF *AMICI CURIAE*[1]**

The First Amendment Lawyers Association (FALA) is a non-profit nationwide association of hundreds of attorneys devoted to protecting free expression under the First Amendment who represent businesses and individuals engaged in constitutionally protected expressive activity. For more than a half-century, FALA's members have advocated against governmental censorship. FALA often appears as *amicus curiae* in the Supreme Court and other appellate courts in cases implicating First Amendment rights, and its members have participated in many of the landmark cases that define and strengthened protections for freedom of expression. *E.g., Ashcroft v. Free Speech Coal., Inc.*, 535 U.S. 234 (2002) (successful challenge to Child Pornography Prevention Act argued by FALA member and former president H. Louis Sirkin, Of Counsel for FALA here) (hereafter "*Free Speech Coalition*"); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) (successful challenge to Telecommunications Act's "signal bleed" provision argued by FALA

[1] No counsel for a party authored this brief in whole or in part. Further, no person, other than *amici*, their members, or their counsel contributed money intended to fund this brief's preparation or submission. All parties consent to the filing of this brief.

member and former president Robert Corn-Revere). FALA also has a tradition of submitting *amicus* briefs to the Supreme Court on issues involving the First Amendment. *E.g., Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617 (2018) (*amicus* brief submitted by FALA); *City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774 (2004) (*amicus* brief submitted by FALA); *United States v. 12,200-ft Reels of Super 8mm Film*, 409 U.S. 909 (1972) (granting FALA's motion to submit *amicus* brief).

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended individual rights through public advocacy, strategic litigation, and *amicus curiae* filings in cases that implicate expressive rights under the First Amendment without regard to the speakers' views. FIRE's work includes protecting expressive rights in the digital realm—ensuring that courts apply the First Amendment's protections consistently, regardless of the means used for expression, and that they prevent the subversion or diminution of expressive rights based on misunderstandings or fears about emerging technologies. *See, e.g.*, Brief of FIRE as *Amicus Curiae* in Support of Plaintiff-Appellant, *Netflix,*

*Inc. v. Babin*, 88 F.4th 1080 (5th Cir. 2023); Brief of FIRE as *Amicus Curiae* in Supp. of Petitioners in No. 22-555 and Respondents in No. 22-277, *NetChoice, LLC v. Paxton*, Nos. 22-555 & 22-277 (Dec. 6, 2023); Brief of FIRE et al. as *Amici Curiae* in Support of Petitioners, *TikTok Inc. v. Garland*, No. 24-656 (U.S. argued Jan. 10, 2025).

## INTRODUCTION & SUMMARY OF ARGUMENT

The district court correctly held the government may not prosecute Anderegg for privately possessing allegedly obscene images of nude boys that are concededly not real children but rather were generated through artificial intelligence. In *Stanley v. Georgia*, 394 U.S. 557 (1969), the Supreme Court held the First Amendment protects the right to possess obscenity in the privacy of one's home because "[o]ur whole constitutional heritage rebels at the thought of giving government the power to control men's minds." *Id.* at 565. This is because "[i]f the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch." *Id.*

The only exception to this rule involves child sexual abuse material, which *Stanley* does not reach. But the Supreme Court made clear over two decades ago that unprotected "child pornography" under *New York v. Ferber*, 458 U.S. 747 (1982), includes only depictions of real children, *i.e.*, not virtual images. *Free Speech Coalition*, 535 U.S. 234 (2002). Nevertheless, the government asks this Court to reverse based on

Anderegg's use of generative AI to create the images at issue, but binding precedent precludes doing so.

The district court correctly dismissed the charge against Anderegg in proper recognition that their creation with AI neither affects the constitutional analysis nor that the Supreme Court's decisions in *Stanley* and *Free Speech Coalition* control. The technology in this case is new, but the legal principles are not. Whatever tools may evolve to create images that fall outside that description, the government has no power to limit possession to protect imaginary children.

The government suggests Anderegg's use of generative AI to create the images makes them "real enough" to override the constitutional protection established in *Stanley*. But *Ferber* made clear that depictions made "real enough" by using "a person over the statutory age who perhaps looked younger" are protected by the First Amendment. 458 U.S. at 763. The same must be true of achieving the same end by technology that avoids using actual minors.

If the First Amendment were subject to being undermined by the evolution of technology, its robust protections would have dwindled with the advent of each new technology, including cable television, the

Internet, interactive video games, or social media. But the law is the opposite: "'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Brown v. EMA*, 564 U.S. 786, 790 (2011), (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)).[2]

This is a straightforward case. The government has argued before that virtual child pornography was no different from the real thing, and failed to persuade the Supreme Court, *Free Speech Coalition*, 535 U.S. 234, and AI's mainstreaming as a tool for content creation does not bolster its position. The issue is not whether courts should *extend Stanley* to encompass the material Anderegg possessed, but whether anything justifies *narrowing Stanley* to exclude obscene material depicting clearly fictional children. The government offers no argument here that has not already been rejected.

Ultimately, the government may constitutionally prosecute simple possession of expressive material *only if* it is child pornography, because

---

[2] *See also Reno v. ACLU,* 521 U.S. 844 (1997); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000); *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).

the interests that justify excluding it from the First Amendment do not otherwise apply to private possession in the home. Those interests, grounded in the welfare of the actual child depicted, do not apply if there is no real child involved, as *Free Speech Coalition* held. Absent an actual child victim, the government's justifications here amount to the same "paternalistic" interest in keeping obscenity from arousing bad thoughts that the Court rejected in *Stanley*.

## ARGUMENT

## I.   Obscenity and Child Pornography Are Not Interchangeable

This is an obscenity prosecution. It bears mentioning at the outset, because the government's persistent references to standards governing child pornography and its plaintive invocations to protect the welfare of "exploit[ed] … children," Gov't Br. 15, suggest it may have lost sight of the charge at issue. Although some—even most—child pornography may be obscene, as exceptions to the First Amendment, they are conceptually distinct.

That is for good reason. As the Supreme Court explained in *Roth v. United States*, "sex and obscenity are not synonymous." 354 U.S. 476, 487 (1957). A work that depicts sex without rising to the level of obscenity is entitled to full constitutional protection, and its proximity to obscenity—

often marked "only by a dim and uncertain line"—does not allow the relaxation of constitutional standards. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963). To the contrary, "separation of legitimate speech from illegitimate speech calls for sensitive tools," *Marcus v. Search Warrants of Prop. at 104 E. Tenth St., Kansas City, Mo.*, 367 U.S. 717, 731 (1961) (quotation omitted), and "the social value of [a work] can neither be weighed against nor canceled by its prurient appeal or patent offensiveness." *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Att'y Gen. of Com. of Mass.*, 383 U.S. 413, 419 (1966) (plurality op.). Under the test the Supreme Court articulated in *Miller v. California*, no amount of sex allows suppression of a work unless, as a whole, it "lacks serious literary, artistic, political, or scientific value." 413 U.S. 15, 24 (1973).

Child pornography is different, as it involves speech integral to the criminal conduct its creation necessarily involves. Where *Miller* accommodated "the State's interests in protecting the 'sensibilities of unwilling recipients' from exposure to pornographic material," the harm inflicted by child pornography stems directly from its production. *New York v. Ferber*, 458 U.S. 747, 756 (1982). The content of the material is

inextricable from the child abuse required to create it, and the state interest in prosecuting the sexual exploitation of children outweighs any serious literary, artistic, political, or scientific value a work may have. *Id.* at 761 ("It is irrelevant to the child [who has been abused] whether or not the material ... has a literary, artistic, political or social value.") (internal citation omitted).

### A. *Stanley*: Labeling speech obscene does not end the constitutional inquiry.

*Roth* held obscenity unprotected because past practice "assumed" it to be the case. *Roth*, 354 U.S. at 481. Those past cases had not generally undertaken a searching inquiry into the interests justifying excluding a category of material from First Amendment protection, and the Court in *Roth* declined to go further, leaning instead on an implicit historical judgment of obscenity as "utterly without redeeming social importance." *Id.* at 484.

*Stanley v. Georgia* took a different approach, one more in line with the mature First Amendment jurisprudence that developed through the second half of the twentieth century. Rejecting Georgia's argument that constitutional inquiry ends once material is obscene, the Court in *Stanley* noted the cases *Roth* cited dealt primarily with "public distribution or

dissemination" of obscene material, and those that followed similarly concerned governmental power to regulate "*public* actions … taken with respect to obscene material." 394 U.S. at 561 (emphasis added). If the interests animating *Roth* and later cases concerned primarily the public sphere, simply referring back to *Roth* was insufficient to justify prosecuting a man for possessing obscene films in the privacy of his own home. *Id.* at 563.

As the government does here, Georgia claimed the power to protect the welfare of its citizens from what it believed to be the pernicious effects of obscenity. But that interest, the Court explained, amounts to no more than "assertion that the State has the right to control the moral content of a person's thoughts." *Id.* at 565. That idea is inimical to the First Amendment and the "traditional notions of individual liberty" on which this nation was founded. *Id.*

"Whatever the power of the state to control public dissemination of ideas inimical to the public morality, it cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts." *Id.* at 566. "Any other answer leaves the government in control of all of the institutions of culture, the great censor and director of which

thoughts are good for us." *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 330 (7th Cir. 1985), *aff'd mem.* 475 U.S. 1001 (1986).

**B.    *Ferber* and *Osborne*: The involvement of an actual child alters the standard.**

The decisions in *New York v. Ferber* and *Osborne v. Ohio* reaffirm this interest-based approach to regulating speech involving sex. In *Ferber*, the Court confronted something beyond its obscenity precedents. Throughout development of its obscenity doctrine, culminating in *Miller*, the Court focused on balancing state interests in limiting purported harm from consumption of obscenity with the acute danger that laws targeting sexual content would sweep up valuable speech.[3] But New York's interest in combating child pornography rested not on the corrosive content of the material or its effect on the viewer, but the criminal act of harming the child used as its subject. *Ferber*, 458 U.S. at 758.

---

[3] *Ferber,* 458 U.S. at 755 ("[O]ur difficulty was not only to assure that statutes designed to regulate obscene materials sufficiently defined what was prohibited, but also to devise substantive limits on what fell within the permissible scope of regulation."); *see also Roth*, 354 U.S. at 495 ("The history of the application of laws designed to suppress the obscene demonstrates convincingly that the power of government can be invoked under them against great art or literature, scientific treatises, or works exciting social controversy.") (Warren, C.J., concurring).

Production of child pornography necessarily requires child abuse, and the state's interest in preventing it was not reflected in the elements of the *Miller* test. *Id.* at 761. A single, non-simulated sex scene generally will not render a film obscene, but if one of the participants is a child, the child has been abused, regardless of the nature of the rest of the work. *Id.* And where depictions must be so hardcore as to be "patently offensive" by contemporary community standards to be obscene, "a sexually explicit depiction need not be 'patently offensive' … to have required the sexual exploitation of a child for its production." *Id.* Nor can that exploitation be redeemed by any serious value the work might otherwise have. *Id.* The need for "sensitive tools" to distinguish between obscene and non-obscene speech simply is not present where the welfare of a real child is at stake.

*Osborne* was even clearer on the necessity of connecting the proscribed depictions to the exploitation of real children rather than the apparent valuelessness of the speech. *Osborne v. Ohio*, 495 U.S. 103, 108 (1990). The Court distinguished the case at bar from *Stanley* on the grounds that "the interests underlying child pornography prohibitions far exceed" those in prohibiting obscenity. *Id.* Ohio did not seek to prevent possession of child pornography to avoid poisoning the mind of the

viewer, but to "destroy a market for the exploitative use of children." *Id.* at 109. *Osborne* held that *Stanley* is inapplicable to depictions of sexual conduct produced with real children because of how the material was made—not, as the government implies, because of the conduct depicted. Gov't Br. 20–22.

As a First Amendment exception, child pornography is not "obscenity, but worse." As the Supreme Court explained in *United States v. Stevens*, the historical derivation for the categorical exception for child pornography is the exception for speech integral to criminal conduct. 559 U.S. 460, 471 (2010) (noting that *Ferber* "grounded its analysis in a previously recognized, long-established category of unprotected speech"). True, this Court has held the underlying conduct need not be criminally proscribed for images of it to constitute child pornography, *see United States v. Price*, 775 F.3d 828, 838–839 (7th Cir. 2014). But that only reinforces how the constitutional question turns on involvement of a real child, especially given that the *Price* Court rested its analysis on the understanding of *Ferber* illuminated in *Stevens* described above.

*Ferber* did not plug different values into the obscenity formula but grounded its holding in a separate calculus entirely—one premised on

*using real children*, not the value of the speech. 458 U.S. at 762–63. Unlike obscenity, the historical basis for the child pornography exception reflects a judgment that the value of the speech is simply irrelevant.

### C. *Free Speech Coalition*: "Close enough" is not enough for the First Amendment.

In *Free Speech Coalition*, the government tried to defend a categorical ban on virtual child pornography—that is, photo-realistic depictions of sexual conduct involving *fictional* children—in much the same terms it does here for "AI-generated imagery." Gov't Br. 16. It argued virtual child pornography is so indistinguishable from the real thing that the two should be treated interchangeably. *Free Speech Coalition*, 535 U.S. at 249. Under that theory, the First Amendment would permit regulating "virtual abuse" without the limitations of the *Miller* test to guard against censorship.

But as the Court explained, its holdings in *Ferber* and *Osborne* were "anchored … in the concern for the participants, those whom it called the 'victims of child pornography.'" *Id.* at 250. They did not suggest that, absent a real child victim, "other governmental interests would suffice." *Id.* As virtual child pornography involves "no crime and creates no victims by its production," *id.*, it cannot be treated as though it did.

The government here makes the same request of this Court that it did in *Free Speech Coalition*: treat sexually explicit depictions of fictional minors as though they depict a real child, rather than applying obscenity standards. It claims the "need to criminalize the in-home possession of images like Anderegg's relates directly to the 'compelling' need to protect real children from real 'physical and psychological' harm." Gov't Br. 15 (quoting *Ferber*, 458 U.S. at 756–57).

However, the harms *Ferber* discussed do not apply to depictions that do not involve a real child. *Free Speech Coalition*, 535 U.S. at 250; *see also United States v. Fredrickson*, 996 F.3d 821, 825 (7th Cir. 2021). The state interest articulated in *Osborne*—"to destroy a market for the exploitative *use* of children," 495 U.S. at 109 (emphasis added)—does not apply to imaginary images, while the reasons for First Amendment protection upheld in *Stanley* do: protecting a person's "private thoughts" from state control. 394 U.S. at 566. The fact that Section 1466A added "obscene" to "virtual child pornography" merely allows Congress to regulate it constitutionally under *Miller*; it does nothing to neutralize *Stanley*.

Ultimately, the "main worry about obscenity, the main reason for its proscription, is not that it is harmful … but that it is offensive. A work

is classified as obscene not upon proof that" a child will be harmed by its existence, but "that it violates community norms regarding the permissible scope of depictions of sexual or sex-related activity." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 574 (7th Cir. 2001). When the government regulates speech because its offensiveness allegedly brings it outside the First Amendment's protection, the government must abide by the rules the Supreme Court established for regulating obscenity.

At oral argument in *Free Speech Coalition*, the Court repeatedly pressed the government to answer why Congress could not have written the Child Pornography Prevention Act more narrowly by incorporating the *Miller* test and still accomplish its goals. Tr. of Oral Arg. 15–17, 22–24, *Free Speech Coalition*, 535 U.S. 234 (No. 00-715). The government conceded the material Congress intended to target was likely obscene, but it had intentionally chosen to regulate it as child pornography rather than face the limitations on regulating obscenity. *Id.* at 17. And it asked the Court to allow this approach to deal with the "unsatisfying" nature of *Miller*'s case-by-case adjudication through three prongs that guard

against censorship, *id.* at 23–24, while conceding that obscenity regulation cannot reach possession. *Id.* at 17.

The Court declined this invitation. *Free Speech Coalition*, 535 U.S. at 256. So Congress, given the Court's judgment, enacted a new law to reach virtual child pornography only if it was obscene, with all the limitations obscenity jurisprudence requires. The government must accept those limitations here, too, including those imposed by *Stanley*.

## II. The Government Fails to Assert an Interest That Would Justify Narrowing *Stanley*

### A. The government arguments rejected in *Free Speech Coalition* are equally unavailing here.

The government cannot rely on *Stanley*'s "narrowing language" reserving judgment on possession of material other than obscenity where "compelling reasons may exist for overriding the right of the individual to possess those materials." Gov't Br. 30–31 (quoting *Stanley*, 394 U.S. at 568 n.11). To be sure, *Osborne*, drawing on interests *Ferber* cited, presented such sufficiently compelling reasons, but all tied back to preventing child abuse. There are no interests here equivalent to those in *Ferber* for the government to rely upon—quite the opposite. Every justification the government now advances was raised in *Free Speech Coalition* and rejected by the Court.

The government argues, for instance, that offenders can use virtual child pornography to groom minor victims, much the same as they might with material depicting real minors. Gov't Br. 15. But the exact same argument was raised and rejected more than twenty years ago in *Free Speech Coalition*, 535 U.S. at 251. The Court there observed that "there are many things innocent in themselves … such as cartoons, video games, and candy, that might be used for immoral purposes, yet we would not expect those to be prohibited because they can be misused." *Id*. However, "speech within the rights of adults to hear may not be silenced completely in an attempt to shield children from it." *Id*. at 252. Likewise for speech within the rights of adults to privately possess.

At argument in *Free Speech Coalition*, FALA's Of Counsel here noted the same logic would support banning a movie like *The Godfather* out of concern for a child who sees it and decides to go out and start a gang. Tr. at 44. This Court rejected such an argument as grounds for regulating violent video games, *see Am. Amusement Mach.*, 244 F.3d 572, and the Supreme Court agreed. *Brown v. EMA*, 564 U.S. at 797 ("For a time, our Court did permit broad censorship of movies because of their capacity to be 'used for evil,' but we eventually reversed course.") (first

citing *Mutual Film Corp. v. Industrial Comm'n of Ohio,* 236 U.S. 230, 242 (1915), then citing *Joseph Burstyn, Inc.*, 343 U.S. at 502).

Invoking the interests of the minor to whom Anderegg sent the images does not alter this settled First Amendment principle as to the charge for *possessing* them. Gov't Br. 16. If the "evil in question depends on the actor's unlawful conduct," the government may prosecute that conduct; it may not limit First Amendment rights in the name of doing so. *Free Speech Coalition,* 535 U.S. at 252. *See also Packingham v. North Carolina*, 528 U.S. 98, 109 (2017) ("[S]pecific, narrowly tailored laws that prohibit a sex offender from engaging in *conduct* that often presages a sexual crime … must be the State's first resort to ward off the serious harm that sexual crimes inflict.") (emphasis added). It is unclear why the government believes this is an unsolved problem, given that even before *Stanley*, the Supreme Court held it constitutional to prohibit distributing obscenity to minors even if it burdened the rights of adults. *See Ginsberg v. State of N. Y.*, 390 U.S. 629 (1968).[4] This is likely why the government

<hr />

[4] And as the government notes, the Sentencing Guidelines further deter this danger by providing an enhancement for distribution intended to persuade a minor to engage in prohibited sexual conduct. Gov't Br. 16 n.8 (citing U.S.S.G. § 2G2.2(b)(3)(E)).

did, in fact, charge Anderegg with distributing obscene material to a minor. Gov't Br. 7 (describing charge under 18 U.S.C. § 1470).

The government next argues AI-generated imagery is so realistic that prosecuting those who possess real child pornography may become impossible. Gov't Br. 16. Yet it offers nothing to suggest this is presently the case—nor is it a novel concern. Here again, the government repeats an argument rejected in *Free Speech Coalition*, where it claimed that, "as a matter of practical reality," advances in technology had already made it difficult for the government to obtain convictions in cases involving real children. Tr. at 25.

As Justice Scalia then noted, the Child Pornography Prevention Act was motivated by rapid advances in computer imaging technology that Congress found could create images "virtually indistinguishable" from "unretouched photographs." Tr. at 39. The generative AI technology used here is new; the ability to create photorealistic digital images is not. Mr. Sirkin noted then that the evidence of a new "practical reality" impeding prosecutors was limited to a single case the government did not in fact lose. *Id.* at 40–41. In the ensuing two-plus decades, this problem has apparently never prevented a conviction. The arguments in this vein are

at bottom that technology has evolved and rendered *Free Speech Coalition* obsolete, so this Court is no longer bound by it.[5] But, that is not how either the First Amendment or Supreme Court precedent work.

The government also argues it must be allowed to prosecute charges such as that here rather than risk allowing pedophiles to go unpunished, that is, it need not wait for harm to manifest before acting to prevent it. Gov't Br. 17. But again, as *Free Speech Coalition* explained, the government "may not suppress lawful speech as the means to suppress unlawful speech." *Id.* If *Stanley* protects Anderegg's possession of these images—and it does—that possession cannot be criminalized to prevent someone *else* escaping prosecution. "Protected speech does not become unprotected merely because it resembles the latter." *Id.*[6]

---

[5] This argument is a mirror-image of the claim it made in *Free Speech Coalition*: *Ferber* was decided before computer technology existed, so the First Amendment should not bar Congress from updating pornography statutes to deal with technological developments. Tr. at 19. That view did not fly then, 20 years after *Ferber*, 535 U.S. at 251, and it cannot serve now, 20 years after *Free Speech Coalition*.

[6] Later, the government makes another brief effort at distinguishing this case from *Free Speech Coalition* by hypothesizing un-prosecutable child predators who ostensibly "could avoid prosecution by using AI to manipulate images of actual children to make the child unidentifiable or appear computer-generated." Gov't Br. 33. "The threat to real children is here," the government says, "and it is grave." *Id.* (Never mind that it was "here" twenty years ago.) This theory is hard to take seriously. Someone

The government also argues that allowing the possession of obscene virtual child pornography in the home may "normalize" sexual abuse of children. Gov't Br. 17. It frames this as concern for the welfare of children who may be victimized, attempting to tie its position back to *Ferber* and *Osborne*. Once again, *Free Speech Coalition* already answers the point, noting here that decades of precedent foreclose this rationale. "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." 535 U.S. at 253; *see also United States v. Williams*, 553 U.S. 285, 321 (2008) (Souter, J., dissenting) (describing "pervasive First Amendment doctrine that tolerates speech restriction not on mere general tendencies of expression, or the private understandings of speakers or listeners, but only after a critical assessment of practical consequences) (citing, *inter alia*, *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)).

*Free Speech Coalition* also forecloses the government's bid to prosecute possession of obscene virtual child pornography in order to

---

who wishes to possess images that *appear* to be AI-generated child pornography is unlikely to go to the extreme lengths the government posits when he could accomplish the same result by simply generating the image in the first place. *See Free Speech Coal.*, 535 U.S. at 254.

"reduce the commercial market for this type of material." Gov't Br. 19. The government invokes *Osborne* for this argument, but as the Supreme Court explained in *Free Speech Coalition*, the market for images created by sexually abusing children is not implicated at all by images that do not involve actual child abuse. *Free Speech Coalition*, 535 U.S. at 254.[7] In fact, the Court explained that the opposite is true: "If virtual images were identical to illegal child pornography, the illegal images would be driven from the market by the indistinguishable substitutes. Few pornographers would risk prosecution by abusing real children if fictional, computerized images would suffice." *Id.*

### B. Under *Stanley*, the government may not prosecute private possession of obscenity for the purpose of punishing or preventing bad thoughts.

*Free Speech Coalition* controls here because the charged depictions are clearly imaginary minors. As the district court explained, the "AI images are photorealistic in the sense that they are rendered in a style meant to look like photographs, as opposed to say a painting or drawing"

---

[7] As the Court explained, with actual child pornography, "creation of the speech is itself the crime of child abuse," but with virtual child pornography, "there is no underlying crime at all." *Free Speech Coalition*, 535 U.S. at 254.

but are "in other ways slightly unreal, as AI-generated images sometimes are" as "kind of hybrids with some body parts not precisely matching the figure's faces." App. 12. To the extent they are obscene, *Stanley* controls, and it compels the answer here: The Constitution prevents Anderegg from being prosecuted merely for possessing obscene images in the privacy of his own home.

The government's attempt to distinguish *Stanley* by claiming it did not involve "realistic, AI-generated, obscene images of minors," *see* Gov't Br. 9, 14, 17, 19, 22, misses the point. Methods of expression no doubt have changed greatly since the Supreme Court held it unconstitutional for Georgia to prosecute a man for possessing three reels of eight-millimeter film, *Stanley*, 394 U.S. at 588. But as the Court has made clear over the years, "whatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Brown v. EMA*, 564 U.S. at 790 (citing *Joseph Burstyn, Inc.*, 343 U.S. at 503).

The advent of AI does not alter this well-established constitutional rule. As one court recently observed, the "risks posed by artificial

intelligence and deepfakes are significant," but consistent with the First Amendment, the government cannot address them "with a hammer instead of a scalpel." *Kohls v. Bonta*, 752 F. Supp. 3d 1187, 1199 (E.D. Cal. 2024).

The government tries to recast its interest as a matter of harm prevention, rather than thought control, Gov't Br. 9, but this is nothing new. "The censor is always quick to justify his function in terms that are protective of society." *Memoirs*, 383 U.S. at 431 (Douglas, J., concurring). But as the Court explained in *Stanley*, "if the State is only concerned about printed or filmed materials inducing antisocial conduct, we believe that in the context of private consumption of ideas and information we should adhere to the view that among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law." *Stanley*, 394 U.S. at 566–67. *See Hudnut*, 771 F.2d at 327–30.

The government's real argument here only indirectly involves any danger that the charged depictions might pose. It claims that Anderegg's mere possession of images of imaginary children "is inextricably linked to the sexual exploitation of minors" because it shows a tendency he may

"pose a risk to minors." Gov't Br. 14. This flows from the government's claim that Anderegg "has a sexual interest in actual children in addition to AI generated children," *id.* at 18, and that it must be able to use the statute to preemptively stop people who may act on such bad thoughts.

The idea of imprisoning someone with the *potential* to commit a crime horrifies us in fiction, *see, e.g.,* Philip K. Dick, *The Minority Report* (1956), and is not permitted in law. Basic principles of criminal law teach being "a scoundrel … is not enough for criminal liability." *United States v. Donoho*, 76 F.4th 588, 602 (7th Cir. 2023) (Easterbrook, J., concurring), *cert. denied*, 144 S. Ct. 2683 (2024). And this is especially true when the government seeks to criminalize speech.

Relying on *Stanley*, the Supreme Court in *Free Speech Coalition* held that the government "cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts." 535 U.S. at 253 (quoting *Stanley,* 394 U.S. at 566). And it cautioned that "First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end. The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Id*. For that

simple reason, the First Amendment does not permit the government to engage in "thought control." *Hudnut*, 771 F.2d at 328.

## CONCLUSION

The district court thus correctly held the government has no power to punish private possession of obscenity if it does not depict an actual child. This Court should affirm.

Dated: August 21, 2025

/s/ *Jeff Scott Olson*

Jeff Scott Olson
   *Counsel of Record*
THE JEFF SCOTT OLSON LAW FIRM, S.C.
1025 Quinn Drive, Suite 500
Waunakee, WI 53597-2502
(608) 283-6001
jsolson@scofflaw.com

*Of Counsel:*
H. Louis Sirkin
FIRST AMENDMENT
LAWYERS ASSOCIATION
SANTEN & HUGHES
600 Vine Street, Suite 2700
Cincinnati, Ohio 45202
(513) 721-4450
hls@santenhughes.com

Hannah Abbott
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, PA 19106
(215) 717-3473
hannah.abbott@thefire.org
Counsel for *Amici Curiae*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,349 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: August 21, 2025

/s/ *Jeff Scott Olson*
_____
Jeff Scott Olson
*Counsel of Record*

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 21, 2025, an electronic copy of the foregoing was filed with the Clerk of this Court using the CM/ECF system, and that all parties will be served through that system.

/s/ *Jeff Scott Olson*
Jeff Scott Olson
*Counsel of Record*