In the

# United States Court of Appeals

## For the Seventh Circuit

No. 25-1354

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

STEVEN ANDEREGG,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:24-cr-0050 — **James D. Peterson**, *Chief Judge.*

ARGUED OCTOBER 30, 2025 — DECIDED AUGUST 25, 2026

Before LEE, PRYOR, and KOLAR, *Circuit Judges*.

LEE, *Circuit Judge*. Steven Anderegg is charged with producing, distributing, and possessing visual depictions of minors engaged in sexually explicit conduct and transferring such material to a minor under the age of sixteen. According to the government, Anderegg produced these images using Stable Diffusion, a generative artificial intelligence ("GenAI") software that allowed him to create hyper-realistic images of prepubescent children engaging in sexually explicit acts.

When Anderegg moved to dismiss the indictment, the district court granted the motion as to the possession charge and denied the remainder. In doing so, the court held that 18 U.S.C. § 1466A(b)(1) was unconstitutional as applied to Anderegg because, under *Stanley v. Georgia*, individuals have a First Amendment right to possess obscenity in the privacy of their home. 394 U.S. 557 (1969). Moreover, in the district court's view, the government's attempts to justify a prohibition on the possession of *virtual* child sexual abuse material ("CSAM") ran headlong into *Ashcroft v. Free Speech Coalition*, where the Supreme Court rejected substantially identical arguments.[1] 535 U.S. 234, 250 (2002). This is despite the Supreme Court's prior holding in *Osborne v. Ohio*, which permitted the government to proscribe the in-home possession of

[1] Federal criminal law defines "child pornography" as the "visual depiction" of a minor "engaging in sexually explicit conduct." 18 U.S.C. § 2256(8); *see also United States v. Williams*, 553 U.S. 285, 288 (2008) (child pornography generally "consists of sexually explicit visual portrayals that feature children."). More recently, the Fourth Circuit has recognized that "the term 'child sexual abuse material' more 'accurately reflects what is depicted—the sexual abuse and exploitation of children.'" *United States v. Tucker*, 60 F.4th 879, 887 (4th Cir. 2023) (citation modified); *see also* Child Sexual Abuse Material, U.S. Dep't of Just. 1 (June 2023), https://www.justice.gov/d9/2023-06/child_sexual_abuse_material_2.pdf [https://perma.cc/E3HM-AX7Q] (Department of Justice explaining that although the term "child pornography" appears in some federal statutes, the term "child sex abuse material" is preferred). Thus, the Fourth Circuit has used "child sexual abuse material" interchangeably with the term "child pornography" to "reflect more accurately the abusive and exploitative nature of [the act]." *United States v. Kuehner*, 126 F.4th 319, 322 n.1 (4th Cir. 2025). The Second Circuit has followed suit. *United States v. Guard*, 152 F.4th 375, 381 n.2 (2d Cir. 2025). Following their lead, we also employ the term CSAM where possible.

CSAM depicting *actual* children. 495 U.S. 103, 109–11 (1990). The government then filed this interlocutory appeal, challenging the dismissal of the possession charge.

We now live in an age where GenAI models can render images depicting the abuse of virtual children that are virtually indistinguishable from those depicting the abuse of actual children. This case illuminates how this evolving technology complicates the lines drawn by the Supreme Court in *Stanley*, *Osborne*, and *Free Speech Coalition*. Indeed, in *Free Speech Coalition*, the Supreme Court addressed the scope of First Amendment protections for virtual CSAM, but that was nearly twenty-five years ago, and the image-generation technology available today was likely unimaginable back then. Given the relentless advancement in artificial intelligence models, we have some concerns about the lines these cases draw, but we are not free to redraw them ourselves. *See United States v. Rush*, 130 F.4th 633, 637, 638 (7th Cir. 2025) ("The rule of law demands we follow binding Supreme Court precedent. … [W]e leave to the Supreme Court the prerogative of overruling its own decisions."). Because we conclude that *Stanley* and *Free Speech Coalition* control Anderegg's as-applied challenge to § 1466A(b)(1), we must affirm.

## I. Background

According to the government, in October 2023, Meta Platforms, Instagram's parent company, reported the online transmission of potential CSAM to the CyberTipline of the National Center for Missing and Exploited Children ("NCMEC"). *See* 18 U.S.C. § 2258A. An Instagram user apparently sent a direct message containing what appeared to be AI-generated images depicting CSAM to an account belonging to a minor. According to Meta, at least one image depicted

"what appeared to be a … prepubescent juvenile male … with his legs spread far apart exposing his erect penis." Meta also noted that the image appeared to be computer-generated. The corresponding message history showed the account user explaining to the minor how he had created the images by inputting text prompts into Stable Diffusion, a text-to-image GenAI model.

Law enforcement linked the account to Anderegg, whose résumé indicated that he was a software engineer with a background in AI models. Law enforcement then executed a search warrant of his home, his personal laptop, two other cell phones, and other devices.

The government alleges that Anderegg installed Stable Diffusion on his personal laptop and added software components that provided the program with the ability to create depictions of human genitalia. He then used the program to generate photo-realistic images of minors in sexually explicit positions. To produce these images, Anderegg used curated text prompts to generate these images and further refined the output by employing negative prompts to exclude depictions of adults. This process generated hundreds of images depicting nude or semi-clothed prepubescent minors displaying or touching their genitals. Other images, according to the government, portrayed prepubescent minors touching adult male penises or engaging in sexual intercourse.[2]

Anderegg was charged with (1) "knowingly produc[ing]" and (2) "knowingly distribut[ing]" visual depictions of

[2] The government concedes that the images for which Anderegg is charged do not depict an actual child, nor can they be linked to an actual child. Oral Argument at 21:43.

minors engaged in sexually explicit conduct as well as (3) "knowingly transferr[ing]" such material to a minor under the age of sixteen in violation of 18 U.S.C. § 1466A(a)(1), (d)(1). He was also charged in Count 4 with "knowingly possess[ing] at least one visual depiction that depicted a minor engaging in sexually explicit conduct and was obscene, and any depiction involved in the offense had been shipped and transported in interstate and foreign commerce" in violation of 18 U.S.C. § 1466A(b)(1), (d)(4).

Anderegg filed a flurry of motions, including a motion to dismiss Count 4. As to that count, he argued that being convicted of possessing CSAM would violate his First Amendment rights as recognized by *Stanley*. The district court agreed and dismissed the possession charge but left the remaining counts intact. The government appeals.

## II. Discussion

We review *de novo* the district court's determination that § 1466A(b)(1) is unconstitutional as applied to Anderegg. *See United States v. Sheikh*, 164 F.4th 629, 633 (7th Cir. 2026) ("We review the constitutionality of a federal statute de novo.") (citation omitted). In considering an as-applied challenge, "we examine only the facts of the case before us and not any set of hypothetical facts under which the statute might be unconstitutional." *United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011). And, when reviewing the dismissal of Count 4, we accept the indictment's allegations as true. *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009). We start with a discussion of the Supreme Court cases most pertinent to our inquiry.

## A. Applicable Supreme Court Precedent

### 1. Obscenity, CSAM, and the Home

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech." U.S. Const. Amend. I. "At the same time, not all speech is protected." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025). Obscenity, along with certain other categories of speech, has historically fallen "outside the scope of the First Amendment." *Id.* (citation omitted); *see also Roth v. United States*, 354 U.S. 476, 485 (1957) ("[O]bscenity is not within the area of constitutionally protected speech."). And, although the precise meaning of "obscenity" is difficult to pin down, the Supreme Court has offered the following articulation: "[S]peech is obscene to the public at large—and thus proscribable—if (a) 'the average person, applying contemporary community standards[,] would find that the work, taken as a whole, appeals to the prurient interest'; (b) 'the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law'; and (c) 'the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.'" *Paxton*, 606 U.S. at 472 (quoting *Miller v. California,* 413 U.S. 15, 24 (1973)).

At the same time, "[t]he Constitution extends special safeguards to the privacy of the home." *United States v. Orito*, 413 U.S. 139, 142 (1973). The Supreme Court addressed the clash of these two principles—the government's interest in proscribing obscenity and an individual's privacy in one's home—in *Stanley.* 394 U.S. 557. There, law enforcement discovered three reels of eight-millimeter films containing obscene material at the defendant's home, and he was later charged and convicted of knowingly possessing obscene

matter in violation of Georgia law. The defendant challenged the conviction on First Amendment grounds, and the Supreme Court agreed.

Acknowledging that the government retains "broad power to regulate obscenity," the Supreme Court held that the State's "power simply does not extend to mere possession by the individual in the privacy of his own home." 394 U.S. at 568. "If the First Amendment means anything," the Court explained, "it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch." *Id.* at 565.

Along the way, the Court had no trouble rejecting the State's argument that its "right to protect the individual's mind from the effects of obscenity" entitled it to reach into an individual's home. *Id.* Indeed, "the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy," the Supreme Court declared, is "fundamental to our free society." *Id.* at 564*; see United States v. Reidel*, 402 U.S. 351, 356 (1971) ("The personal constitutional rights of those like Stanley to possess and read obscenity in their homes and their freedom of mind and thought do not depend on whether the materials are obscene or whether obscenity is constitutionally protected. Their rights to have and view that material in private are independently saved by the Constitution.").

Approximately a decade after *Stanley*, the Supreme Court addressed whether the promotion and sale of CSAM implicated First Amendment rights. In *New York v. Ferber*, New York had enacted a broadly worded statute proscribing the use of a child under the age of sixteen in a "performance" that includes "sexual conduct." 458 U.S. 747, 751 (1982) (citation

omitted). The statute defined "performance" as "any play, motion picture, photograph or dance," and defined "sexual conduct" as "actual or simulated sexual intercourse … or lewd exhibition of the genitals." *Id*. (citation modified). The defendant was arrested after selling two films to an undercover police officer that depicted young boys masturbating; he was later convicted and appealed. The New York Court of Appeals reversed, holding that the statute violated the First Amendment because, among other things, it was over-inclusive by prohibiting the distribution of "materials which are traditionally entitled to constitutional protection," such as medical books and educational sources. *Id*. at 752 (citation modified). In making this determination, the Court of Appeals relied on a state-law definition of obscenity that mirrored the standard espoused in *Miller*. *Id.* at 753 (citation modified).

The Supreme Court reversed. Recognizing that the New York Court of Appeals' reliance on *Miller* was not "unreasonable," *id.*, the Court nevertheless held that "[t]he test for child pornography is separate from the obscenity standard enunciated in *Miller*" because CSAM was different from adult obscene materials in several important ways, *id.* at 764. First, the state's interest in protecting the physical and psychological well-being of minors and preventing the sexual exploitation and abuse of children "constitute[d] a government objective of surpassing importance." *Id.* at 757. Second, the distribution of CSAM was "intrinsically related to the sexual abuse of children" because the materials "are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." *Id.* at 759 (footnote omitted). Third, the advertising and selling of CSAM "provide[d] an economic motive for and are thus an integral part of the production of

such materials." *Id.* at 761 (footnote omitted). Fourth, the value of performances and photographs of children engaged in lewd sexual conduct was "exceedingly modest, if not *de minimis*." *Id.* at 762. Lastly, classifying CSAM as outside the protection of the First Amendment was not inconsistent with the historical approach the Court employed when analyzing speech. *Id.* at 763. Thus, the Court concluded, CSAM (whether obscene or not) was not constitutionally protected.

Eight years later, the Supreme Court addressed whether the protections articulated in *Stanley* would extend to the possession of CSAM in one's home. In *Osborne v. Ohio*, the defendant was convicted of violating an Ohio law prohibiting the possession and viewing of CSAM after the police found in his home four photographs of adolescents in sexually explicit positions. 495 U.S. at 107. In the defendant's view, the statute was unconstitutional under *Stanley*. The Supreme Court disagreed. "*Stanley* should not be read too broadly," the Court remarked, adding that it had "previously noted that *Stanley* was a narrow holding." *Id.* at 108. The main distinction between *Osborne* and *Stanley*, the Court observed, was "obvious": "The State does not rely on a paternalistic interest in regulating Osborne's mind. Rather, Ohio has enacted [the statute] in order to protect the victims of child pornography; it hopes to destroy a market for the exploitative use of children." *Id.* at 109.

Thus, it was reasonable, the Supreme Court concluded, for Ohio to believe that criminalizing the possession and viewing of CSAM would lessen demand and decrease its production. *Id.* at 109–10. "Given the importance of the State's interest in protecting the victims of child pornography," the Court declared, "we cannot fault Ohio for attempting to stamp out this vice at all levels in the distribution chain." *Id.* at 110. What is

more, the Court observed that the distribution and viewing of CSAM "permanently record the victim's abuse" and "evidence suggest[ed] that pedophiles use child pornography to seduce other children into sexual activity." *Id.* at 111 (citing *Ferber*, 458 U.S. at 759). Such grave interests, the Supreme Court held, allowed Ohio to prohibit the possession and viewing of CSAM even in one's own home notwithstanding *Stanley. See United States v. 12 200-Foot Reels of Super 8mm. Film*, 413 U.S. 123, 127 (1973) (noting that *Stanley* rests on an "explicitly narrow and precisely delineated privacy right"); *United States v. Andersson*, 803 F.2d 903, 906 (7th Cir. 1986) (finding that the Supreme Court has "limited" *Stanley*'s holding "severely").

**2. *Free Speech Coalition*—Virtual CSAM**

Before 1996, Congress had defined child pornography as images made using actual minors. 18 U.S.C. § 2252 (1994). But with the rapid advancement of computer technology, Congress passed the Child Pornography Prevention Act ("CPPA") in 1996 to expand federal prohibitions on CSAM. As relevant here, the CPPA extended the ban beyond images involving actual children to include "any visual depiction, including any … computer-generated image or picture" that "is, or appears to be, of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8)(B) (1996). Thus, the statute criminalized the production, distribution, and possession of virtual CSAM, that is, CSAM "produced without using any real children." *Free Speech Coal.*, 535 U.S. at 239.

In *Ashcroft v. Free Speech Coalition*, the Supreme Court confronted the question of whether virtual CSAM, like actual CSAM, was beyond the First Amendment's reach. *Id.* at 234. In that case, Free Speech Coalition, a trade association for the adult-entertainment industry, mounted a facial challenge to

§ 2256(8)(B), arguing that the provision violated its members' First Amendment rights by chilling protected speech. *Id.* Taking great care to note that the materials at issue did not involve actual children, the Supreme Court agreed.

As an initial matter, the Supreme Court observed that the CPPA sought "to reach beyond obscenity, and it makes no attempt to conform to the *Miller* standard." *Id.* at 240. Put another way, "the CPPA cannot be read to prohibit obscenity, because it lacks the required link between its prohibitions and the affront to community standards prohibited by the definition of obscenity." *Id.* at 249. As a result, the government relied on *Ferber*, where the Supreme Court had allowed States to regulate CSAM whether obscene or not. But the Supreme Court found *Ferber* inapt.

"By prohibiting child pornography that does not depict an actual child," the Court stated, "the statute goes beyond [*Ferber*] which distinguished child pornography from other sexually explicit speech because of the State's interest in protecting the children exploited by the production process." *Id.* at 240 (citing *Ferber*, 458 U.S. at 747, 758); *see Williams*, 553 U.S. at 289 ("[T]he child-protection rationale for speech restriction does not apply to materials produced without children.") (quoting *Free Speech Coal.*, 535 U.S. at 249–51). Consistent with this purpose, the statute challenged in *Ferber* had targeted the "production of the work, not its content." *Id.* at 249 (citation modified). And *Ferber* upheld the statute's prohibition on the production, distribution, and sale of CSAM, because (1) the material constituted "a permanent record of the child's abuse, the continued circulation itself would harm the child," and (2) "the traffic in child pornography was an economic motive for its production." *Id.* at 250 (citing *Ferber*, 458 U.S. at 759–60).

Here, the CPPA targeted virtual CSAM, and because "virtual child pornography is not intrinsically related to the sexual abuse of children, as were the materials in *Ferber*," *id.* at 250 (citation modified), the Court found *Ferber* not to control.[3]

For much the same reason, the Court remarked, *Osborne* too was distinguishable, because it had "anchored its holding in the concern for the participants, those whom it called the 'victims of child pornography.'" *Id.* (citation modified). In *Osborne*, the state had a compelling interest in protecting children by attempting to eliminate CSAM at all levels of the distribution chain and preventing CSAM from being used to solicit minors. *Id.* This was not the case in *Free Speech Coalition*, the Supreme Court declared, because the depictions did not involve actual children.

The Supreme Court then proceeded to refute the various arguments the government had raised to justify the CPPA's prohibition on virtual CSAM. First, the government argued that the CPPA was necessary because virtual CSAM could be used to seduce children. But, if this was the law's purpose, the Court concluded, it was "not narrowly drawn," because "[t]he Government cannot ban speech fit for adults simply because it may fall into the hands of children." *Id.* at 252.

---

[3] Importantly, the Supreme Court in *Free Speech Coalition* distinguished § 2256(8)(B) from § 2256(8)(C), which "prohibits a more common and lower tech means of creating virtual images, known as computer morphing," where creators alter innocent images of real children so that they appear to be engaging in sexual acts. *Id.* at 242. "Although morphed images may fall within the definition of virtual child pornography," the Court remarked, "they implicate the interests of real children and are in that sense closer to the images in *Ferber*. Respondents do not challenge this provision, and we do not consider it." *Id.*

Second, the government argued that virtual CSAM "whets the appetites of pedophiles and encourages them to engage in illegal conduct." *Id.* at 253. But again the Supreme Court was unpersuaded. "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it," the Court noted, and the government had "shown no more than a remote connection between speech that might encourage thoughts or impulses and any resulting child abuse." *Id.*

Third, in the government's view, it was necessary to proscribe virtual CSAM if it wanted to accomplish its goal to eliminate the market for real CSAM. The Court, however, found this theory "implausible," noting that if the two were completely interchangeable, the actual images would be "driven from the market by the indistinguishable substitutes," since "[f]ew pornographers would risk prosecution by abusing real children if fictional, computerized images would suffice." *Id.* at 254.

For its final argument, the government asserted that, because it was often hard to distinguish virtual CSAM from real CSAM, prosecuting those who produced such material using actual children was very difficult. But the Court made short shrift of this argument, declaring that "[t]he Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter." *Id.* at 255.

After *Free Speech Coalition*, Congress went back to the drawing board and enacted the statute at issue here. The Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 ("PROTECT Act") included a new provision which, in part, proscribed possession of "a visual depiction of any kind … that (1)(A) depicts a minor engaging

in sexually explicit conduct; *and (B) is obscene*." 18 U.S.C. § 1466A(a)(1), (b)(1) (emphasis added). This includes any "digital image or picture, computer image or picture, or computer generated image or picture." 18 U.S.C. § 1466A(f)(1). And it expressly does not require that "the minor depicted actually exist." 18 U.S.C. § 1466A(c).

**B. The Merits**

Here, Anderegg challenges the count charging him with possessing obscene virtual CSAM. Anderegg relies on *Stanley* to argue that § 1466A(b)(1) is unconstitutional as applied to him. In essence, he asserts that obscene virtual CSAM should have the same protections as other obscene materials when possessed and viewed at home. Unpacking this argument requires several parts. First, assuming for the sake of argument that obscene virtual CSAM is equivalent to other forms of obscenity, we must assess whether Anderegg's circumstances would fall within the contours of *Stanley*. If the answer to that question is yes, we must evaluate whether obscene virtual CSAM, like actual CSAM, should be treated differently from obscene material generally (and therefore fall outside *Stanley*'s purview) for the reasons articulated in *Osborne*. Finally, as we consider this second question, we must be mindful of the differences between virtual CSAM and actual CSAM that the Supreme Court identified in *Free Speech Coalition*.

**1. *Stanley***

First, the government asks us to distinguish this case from *Stanley* in two ways. First, it contends that Anderegg's alleged possession has a nexus with interstate commerce whereas Stanley's did not. Second, the government reads *Stanley* to

apply only to obscene materials depicting adults not children. Neither argument is persuasive.

Under § 1466A(d)(4), the depiction (or materials used to produce the depiction) must be "shipped or transported in interstate or foreign commerce by any means, including by computer." 18 U.S.C. § 1466A(d)(4). According to the government, "*Stanley* does not apply where the criminal conduct was facilitated through the use of interstate commerce." Because, the argument goes, the government must prove the interstate-commerce link before Anderegg could be convicted under § 1466A(b)(1), Count 4 criminalizes more than the mere possession of obscene material in his home.[4] Instead, it criminalizes Anderegg's use of interstate commerce to come into possession of obscene and sexually explicit images of children.

It is true that *Stanley* only applies to in-home possession of obscenity and that "commerce in obscene material is unprotected by any constitutional doctrine of privacy." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 69 (1973) (citations omitted). This is so because "the protected right to possess obscene material in the privacy of one's home does not give rise to a correlative right to have someone sell or give it to others." *12 200-Foot Reels*, 413 U.S. at 128 (citations omitted). "Nor is there any correlative right to transport obscene material in interstate commerce." *Id.* (citation omitted).

As the Fourth Circuit put it, *Stanley* "did not prohibit the government from regulating the channels of commerce."

---

[4] The government notes that at trial, it "intends to prove that the computer that Anderegg used to produce and possess his imagery had traveled in interstate commerce and that he had downloaded Stable Diffusion from the internet to create those images."

*United States v. Whorley*, 550 F.3d 326, 332 (4th Cir. 2008). And, pursuant to the Commerce Clause, "Congress may impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral or economic nature." *Orito*, 413 U.S. at 144 (quoting *N. Am. Co. v. SEC*, 327 U.S. 686, 705 (1946)).

Nevertheless, we are not convinced by the government's reasoning. The interstate-commerce requirement does not change the fact that the government is using § 1466A(d)(4) to punish Anderegg for possessing obscene material in the home. Although the right *Stanley* pronounced may be narrow, it speaks to the crux of the offense alleged here—Anderegg's actions in "the privacy of the home." *Paris Adult Theatre*, 413 U.S. at 66 (citation modified).

Furthermore, it is worth noting that later Supreme Court cases narrowing *Stanley* all involved to some degree the importing, transporting, or distributing of obscene materials; none expressly addressed in-home possession in and of itself. *See, e.g.*, *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 376 (1971) (selling or giving obscene material to others); *12 200-Foot Reels*, 413 U.S. at 128 (importing obscene materials even for private use); *Orito*, 413 U.S. at 141–43 (transporting obscene material in interstate commerce); *Whorley*, 550 F.3d at 333 (distinguishing *Stanley* by "focusing on the movement of obscene material in channels of commerce, and not on its mere possession.").

Similarly, here, the government has also charged Anderegg with production of obscene virtual CSAM (Count 1) and with distributing and transferring obscene virtual CSAM

(Counts 2 and 3). The question before us is narrow: does the First Amendment allow the government to proscribe the in-home possession of obscene virtual CSAM. And, during oral argument, the government conceded that, with respect to Count 4, it planned to rely solely on the fact that Anderegg possessed the obscene material in his home. Oral Argument at 6:46.

Thus, as a practical matter, the government's interstate-commerce argument has no force. As the district court observed, "the obscene materials in *Stanley* (reels of eight-millimeter film) almost certainly moved in interstate commerce too." But this did not matter to the Supreme Court in *Stanley*. Once the production materials left the public sphere and entered the home, the government's regulatory power was eclipsed by the individual's First Amendment "right to receive information and ideas, regardless of their social worth." *Stanley*, 394 U.S. at 564.[5]

---

[5] The purpose of the interstate-commerce requirement is likely less substantive and more jurisdictional. "In our federal system, 'Congress cannot punish felonies generally,' *Cohens v. Virginia,* 6 Wheat. 264, 428 (1821); it may enact only those criminal laws that are connected to one of its constitutionally enumerated powers, such as the authority to regulate interstate commerce. As a result, most federal offenses include, in addition to substantive elements, a jurisdictional one, like the interstate commerce requirement." *Torres v. Lynch*, 578 U.S. 452, 457 (2016). And "[j]urisdictional elements do not describe the 'evil Congress seeks to prevent,' but instead simply ensure that the Federal Government has the constitutional authority to regulate the defendant's conduct." *Rehaif v. United States*, 588 U.S. 225, 230 (2019) (citation omitted). "Because jurisdictional elements normally have nothing to do with the wrongfulness of the defendant's conduct," *id.*, we hesitate to rely on them as meaningful distinctions for purposes of substantive constitutional analysis.

The government next posits that *Stanley* is best read as applying only to obscene materials involving adults engaged in sexually explicit activity, not children. According to the government, the phrase "obscene material" from *Stanley* does not necessarily cover the entire universe of obscene materials. Rather, citing *Williams*, 553 U.S. at 288, the government argues that "obscene material" is best understood to only address the obscene material at issue there, adult pornography.

We see no basis to read *Stanley* in such a limited fashion. It is true that in *Williams*, the Supreme Court stated, "We have held that the government may criminalize the possession of child pornography, even though it may not criminalize the mere possession of obscene material involving adults." *Id*. But immediately following this sentence, the Court cited to *Stanley* with *Osborne*. Rather than inferring from the words "involving adults" the broad proposition the Supreme Court would apply *Stanley* only to obscene adult-based materials, the sentence is better understood to reflect the distinction its cases have historically drawn between CSAM and obscenity generally. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373 (2023) ("The language of an opinion is not always to be parsed as though we were dealing with the language of a statute."). What is more, the reasoning of *Stanley* did not turn on the contents of the obscene materials at issue, rather its holding was predicated on the location—the home. *See* 394 U.S. at 568 ("[The] power to regulate obscenity … simply does not extend to mere possession by the individual in the privacy of his own home.").

Accordingly, assuming that the First Amendment would treat obscene virtual CSAM the same as other obscene

materials, we conclude that the facts of this case fall within the bounds of *Stanley*.

**2. Virtual CSAM versus CSAM**

The preceding conclusion begs the next question: whether, for First Amendment purposes, obscene virtual CSAM is more akin to actual CSAM or obscene materials generally. If it is the former, then *Osborne* and not *Stanley* would apply. To recap: *Stanley* prohibits the criminalization of possession of obscene material in the home. *Ferber* held that CSAM involving actual children is not obscenity but its own category of speech not entitled to First Amendment protection due to the government's compelling interests in protecting child victims. For the same reasons, *Osborne* permits the government to proscribe the possession of CSAM involving actual children in the home. Then came *Free Speech Coalition*, which prohibits the criminalization of CSAM that involves no actual children and that is not obscene. Anderegg is charged with possessing in his home virtual CSAM that does not depict an actual child but that is obscene.

Because the images for which Anderegg is charged do not depict an actual child, *Ferber* and *Osborne* do not directly apply to this case. *See Free Speech Coal.*, 535 U.S. at 249–51. That said, *Stanley* left open the possibility that "compelling reasons may exist for overriding the right of the individual to possess [certain] materials." 394 U.S. at 568 n.11.

The government argues that the same compelling interest the Supreme Court recognized in *Ferber* and *Osborne* exists here—the protection of actual children from sexual exploitation and abuse. And it attempts to distinguish *Free Speech Coalition* by pointing out that § 1466A(b)(1) is limited to obscene

material unlike the statute in *Free Speech Coalition*. The problem for the government, however, is that the justifications it offers here for proscribing the possession of obscene virtual CSAM were all expressly discussed and rejected by the Supreme Court in *Free Speech Coalition*.

First, the government argues that offenders may use obscene virtual CSAM to groom minors into engaging in sexually explicit conduct. To be sure, it is well-known that abusers utilize obscene images to groom their minor victims. *See, e.g.*, *United States v. Chambers*, 642 F.3d 588, 593 (7th Cir. 2011); *United States v. Reilly*, 662 F.3d 754, 761 (6th Cir. 2011); *United States v. Reaves*, 253 F.3d 1201, 1205 (10th Cir. 2001); Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, § 121 subsection 1(8), 110 Stat. 3009 (congressional finding that the grooming risks are "the same" whether the imagery shows actual or computer-generated children). Moreover, as technological advances allow creators to render virtual images indistinguishable from real ones, virtual CSAM may come to pose more of a danger than the cartoons or video games referenced in *Free Speech Coalition*. But we cannot ignore the fact that the Supreme Court flatly rejected the same argument the government advances here. *Free Speech Coal.*, 535 U.S. at 251. In the Supreme Court's words, "the government may not prohibit speech because it increases the chance an unlawful act will be committed at some indefinite future time." *Id.* at 253 (citation modified).

Relatedly, the government argues that an individual's engagement with AI-generated material depicting children engaged in sexual conduct may normalize sexual activity with children in a way that poses risks to actual children. But, once again, *Free Speech Coalition* is on all fours. "Without a

significantly stronger, more direct connection [between virtual CSAM and child exploitation]," the Supreme Court declared, "the Government may not prohibit speech on the ground that it may encourage pedophiles to engage in illegal conduct." *Id.* at 253–54.

To be sure, the Supreme Court left open the door for the government to make "a significantly stronger, more direct connection" between virtual CSAM and child abuse. *Id.* But, rather than providing more support for its contention here, the government merely restates the same arguments it made in *Free Speech Coalition*. *Compare* Brief for the Petitioners at 4–5, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002) (No. 00-795) 2001 WL 432538, at *4–5 (arguing that Congress determined that "child pornography is often used as part of a method of seducing other children into sexual activity," and "Congress found that computer-generated images of children engaged in sexually explicit conduct can be just as effective in seducing children into sexual activity as photographic images of real children."), *with* Opening Brief for the United States at 15, *United States v. Anderegg*, No. 25-1354 (7th Cir. May 14, 2025) ("[O]ffenders may use images of the type that Anderegg possessed, like they commonly use similar-type images showing actual children, to groom minors into engaging in sexually explicit conduct.").[6]

[6] Our own nonexhaustive perusal of the relevant literature reveals inconclusive results. Most recently, the United States Sentencing Commission released a study finding that "43.9 percent of possession offenders … engaged in aggravating conduct either prior to or concurrently with their instant federal child pornography offense." U.S. Sent'g Comm'n, Federal Sentencing of Child Pornography, Non-Production Offenses, 41 (2021).

Next, the government argues that prohibiting the possession of obscene virtual CSAM will help the government reduce the commercial market for actual CSAM. But the Supreme Court in *Free Speech Coalition* squarely addressed and rejected this argument as well, finding it "somewhat implausible." *Free Speech Coal.*, 535 U.S. at 254. After all, the Court noted, if the demand for virtual CSAM were the same as for actual CSAM, few would create actual CSAM and "risk prosecution by abusing real children if fictional, computerized images would suffice." *Id*.

Finally, the government argues that due to technological advancements, AI-generated images are becoming increasingly indistinguishable from imagery depicting actual children, making the task of proving that an image depicts an actual child increasingly difficult. Thus, permitting the in-home possession of virtual CSAM, it contends, would make prosecuting the possession of actual CSAM exceedingly complicated and may insulate offenders who possess images of

---

"Most current social science research suggests that viewing child pornography, in the absence of other risk factors, does not "cause" individuals to commit sex offenses." U.S. Sent'g Comm'n, Federal Child Pornography Offenses 102 (2012) (citation modified). As such, it remains "unclear if (a) fantasies encourage the acting out of behaviors, (b) fantasies represent active reliving of previous acts, or (c) some third variable (e.g., sex drive) independently generates both fantasies and behavior." Kevin M. Williams et al., *Inferring Sexually Deviant Behavior From Corresponding Fantasies: The Role of Personality and Pornography Consumption*, 36 Crim. Justice & Behav. 198, 206 (2009) (citation modified). Indeed, "some research reports that, for offenders who were already assessed as low risk for future sexual offending, frequency of pornography use does not appear to predict criminal recidivism." U.S. Sent'g Comm'n, Federal Child Pornography Offenses, 104 (2012).

actual children. Along similar lines, the government worries that it will be forced to spend its limited time and resources searching for children who do not exist to the detriment of children who do exist.

And so, the government urges us to look beyond *Free Speech Coalition* entirely, given the twenty-three years that have passed since the case was decided. *Cf. Paxton*, 606 U.S. at 489 (noting that *Free Speech Coalition* was decided "when the internet was 'still more of a prototype than a finished product'") (citation omitted). But despite the rapid advances in technology over that span, "[t]he broad authority to proscribe child pornography is not … unlimited." *Williams*, 553 U.S. at 289. And the argument the government advances today—that it is becoming increasingly difficult to distinguish between virtual CSAM and CSAM produced with actual children—is still identical to the one the Supreme Court rejected in *Free Speech Coalition*.

Given the ever-accelerating march of imaging-generation technology, we have some misgivings about applying *Free Speech Coalition* here, but "unless we wish anarchy to prevail within the federal judicial system," we are dutybound to follow it. *Hutto v. Davis*, 454 U.S. 370, 375 (1982); *see id.* ("[A] precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be."); *see Paxton*, 606 U.S. at 491 (noting that cases "do not cease to be precedential simply because technology has changed so dramatically").

In sum, because Anderegg is accused of possessing obscene materials at home, we agree that his circumstances fall within the bounds of *Stanley*. And, because the arguments the government advances to remove the materials in question

from *Stanley*'s purview have all been squarely rejected by the Supreme Court in *Free Speech Coalition*, we conclude that § 1466A(b)(1) is unconstitutional as applied to Anderegg.

* * *

For the foregoing reasons, the judgment is AFFIRMED.

LEE, *Circuit Judge*, joined by KOLAR, *Circuit Judge*, concurring. As the court's opinion explains, this case is controlled by *Stanley* and *Free Speech Coalition.* I write separately to note that, given the significant advances in computer-generated image technology, particularly in the field of artificial intelligence, we would benefit from additional guidance from the Supreme Court regarding the intersection between the First Amendment and virtual CSAM if an appropriate case should arise.

As one commentator observed, "In 2002, the Court's reasoning [in *Free Speech Coalition*] made sense: Technology was far less developed than it is today." Jessica L. Terkovich, *The Emerging Danger of AI-Generated Child Sexual Abuse Material and an Unprepared Crim. Code*, 45 N. Ill. U. L. Rev. 398, 404 (2025). Yet nearly twenty five years after the Court's decision, *Free Speech Coalition* controls in a day where "AI-generated CSAM is virtually indistinguishable from CSAM created through the physical abuse of a child." *Id.*; *see* Cecilia Kang, *A.I.-Generated Images of Child Sexual Abuse Are Flooding the Internet*, N.Y. Times (July 18, 2025), https://www.nytimes.com/2025/07/10/technology/ai-csam-child-sexual-abuse.html [https://perma.cc/HZ2A-Y9MN] ("Only in recent months have A.I. tools become good enough to trick the human eye with an image or video.").

At the time of *Free Speech Coalition*, several Justices predicted as much. Justice O'Connor echoed many of the concerns the government argues today, namely that "rapidly advancing technology soon will make it all but impossible to" enforce prohibitions of actual CSAM and "[c]omputer-generated images … bear a remarkable likeness to actual human

beings." *Free Speech Coal.*, 535 U.S. at 267, 264 (O'Connor, J. concurring in the judgment in part and dissenting in part).

Justice Thomas too forecasted that "technology may evolve to the point where it becomes impossible to enforce actual child pornography laws because the Government cannot prove that certain pornographic images are of real children." *Id.* at 259 (Thomas, J. concurring). In his view, "if technological advances thwart prosecution of 'unlawful speech,' the Government may well have a compelling interest in barring or otherwise regulating some narrow category of 'lawful speech' in order to enforce effectively laws against pornography made through the abuse of real children." *Id.*

According to some experts, that day may have arrived. Recent data suggests that the influx of AI-generated images reported to the NCMEC CyberTipline imposes increasing burdens on law enforcement. *See Addressing Real Harm Done by Deepfakes: Hearing Before the Subcomm. on Cybersecurity, Info. Tech., and Gov't Innovation of the H. Comm. on Oversight and Accountability*, 118th Cong. 6 (2024) (testimony of John Shehan, Vice President, Exploited Children Division, NCMEC), https://www.congress.gov/118/meeting/house/116953/witnesses/HHRG-118-GO12-Wstate-ShehanJ-20240312.pdf [https://perma.cc/94JL-EAZK]; *see also Generative AI CSAM is CSAM*, Nat'l Ctr. for Missing & Exploited Child. (Mar. 11, 2024), https://www.missingkids.org/blog/2024/generative-ai-csam-is-csam [https://perma.cc/37KT-AZ5N] ("Even the images that do not depict a real child put a strain on law enforcement resources and impede identification of real child victims."); *State Laws Criminalizing AI-Generated or Computer-Edited Child Sexual Abuse Material (CSAM)*, Enough Abuse,

https://enoughabuse.org/get-vocal/laws-by-state/state-laws-criminalizing-ai-generated-or-computer-edited-child-sexual-abuse-material-csam/ [https://perma.cc/KS7J-YCB5] (noting that perpetrators may "disguise pictures of real children being abused by making the image look computer-generated").

What is more, AI-generated CSAM may also present other challenges not raised by the government in this appeal. For example, researchers have found that "a major dataset used for training image-generating AI contained hundreds of CSAM images." Benjamin L.W. Sobel, *A Real Account of Deep Fakes*, 124 Mich. L. Rev. 871, 930 (2026) (citation omitted). Thus, unlike the virtual CSAM at issue in *Free Speech Coalition*, the market for AI-generated virtual CSAM images may impact the demand for actual CSAM on which the AI models can train. Such a finding would implicate many of the concerns raised in *Osborne*. *See* 495 U.S. at 110.

In this case, the record is insufficient to evaluate these complex issues, and, of course, we are bound by the dictates of *Free Speech Coalition*. But it goes without saying that "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *Ferber*, 458 U.S. at 757. The stakes are high, and we must be mindful of the ever-accelerating advancements in image generation technology.